UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------------------------------

D. MICHAEL JEWETT,

Plaintiff,

    -against-

IDT CORPORATION; HOWARD S.
JONAS; MOTTI LICHTENSTEIN; JACK
LERER; DAVID SCHROPFER; AVI
LAZAR; ROBERT SCHIFF; MICHAEL
LEVINE; JONATHAN LEVY; ALEX
SCHWARZ; JAMES A. COURTER;
JOYCE MASON; JOHN CATE; AND
JOHN DOE numbers one through ten,
fictitious names, real names being
unknown, representing the entities or
individuals who engaged in abuse of
process, defamation and intentional
infliction of emotional distress as set
forth herein,

Defendants.

------------------------------------------------------------

Docket No:
CV-04-1454

**SUPPLEMENTAL
PLEADING**

## SUPPLEMENTAL PLEADING

1.    This pleading is being filed pursuant to Federal Rule of Civil Procedure 15(d) as a result of the alleged acts of IDT CORPORATION, its agents servants and employees, performed after the filing of the original complaint in this matter docketed as CV 04-1454 in the United States District Court of New Jersey.

## NATURE OF ACTIONS

2.    This pleading supplements the amended complaint filed on May 14, 2004 in this action.   It provides additional acts, transactions and events occurring or discovered since the filing of

the complaint for purposes of presenting causes of action against all the defendants designated as Intentional Infliction of Emotional Distress. Certain defendants are also included in an additional cause of action under New Jersey Common Law Defamation.

3.     The plaintiff seeks compensatory and punitive damages and attorney's fees for these additional acts.

## THE PARTIES

4.     The plaintiff, D. MICHAEL JEWETT, is currently a resident of Palm Beach County, Florida.

5.     The defendant IDT CORPORATION, (hereinafter "IDT"), is a telecommunications company engaged in interstate commerce with more than 15 employees.

6.     The defendant IDT Corporation is a Delaware for Profit Corporation with principal offices located at 520 Broad Street Newark, New Jersey.

7.     The defendant, HOWARD S. JONAS, upon information and belief, is the Chairman of IDT and a citizen of the State of New York.

8.     The defendant, MORRIS LICHTENSTEIN, upon information and belief, is Chief Executive Officer of IDT Telecom, and is a citizen of the state of New York.

9.    The defendant, JACK LERER, upon information and belief, is the Executive Vice President for International Business Development for IDT, and is a citizen of the State of New York.

10.   The defendant, DAVID SCHROPFER, upon information and belief, is the Executive Vice President for Strategic Management for IDT, and is a citizen of the State of New Jersey.

11.   The defendant, AVI LAZAR, upon information and belief, is Senior Vice President of Global Buying for IDT, and is a citizen of the State of New Jersey.

12.   The defendant, ROBERT SCHIFF, upon information and belief, is the Senior Director of IDT Telecom Sales, and is a citizen of the State of New York.

13.   The defendant, MICHAEL LEVINE, upon information and belief, is the Senior Vice President of Finance for IDT Telecom and is a citizen of the State of New Jersey.

14.   The defendant, JONATHAN LEVY, upon information and belief, is the President for IDT Telecom and is a citizen of the State of New York.

15.   The defendant, ALEX SCHWARTZ, upon information and belief, is legal counsel for IDT Telecom, and is a citizen of the State of New York.

16.   The defendant, JAMES A. COURTER, upon information and belief, is the Co-chairman and Chief Executive Officer for IDT Corp, and is a citizen of the State of New Jersey.

17.   The defendant, JOYCE MASON, upon information and belief, is a Senior Vice President and General Counsel for IDT Corp, and is a citizen of the State of New York.

18.   The defendant, JOHN CATE, upon information and belief, is Vice President for International Network Development for IDT, and is a citizen of the State of New Jersey.

19.   The defendant, JOHN DOE numbers one through ten, fictitious names, real names being unknown, represent the entities or individuals who unlawfully deprived the plaintiff of earnings and subjected him to unlawful employment discrimination as set forth herein.

## JURISDICTION AND VENUE

20.   The court has original jurisdiction of this action pursuant to 28 U.S.C. Sec. 1332 (3) in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States in which citizens or subjects of a foreign state are additional parties

21.   Venue is predicated on 28 U.S.C. Sec. 1391 (a) and (b), in that several of the defendants reside in this district and a

substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND OF THE UNDERLYING LAWSUIT

22.   Plaintiff was hired by IDT on April 15, 2003.

23.   On July 15, 2003 plaintiff completed his probationary employment period and was promoted to a full time executive position with IDT as Associate Regional Vice President for the Caribbean, (ARVP).

24.   In September and October of 2003 the plaintiff objected to and disclosed the unlawful nature of the terms and conditions of a business arrangement between IDT, Mount Salem Management and Teleco Haiti which involved alleged bribe payments to the President of Haiti, Jean Bertrande Aristide, in return for IDT receiving the right to send telephone calls to Haiti for a deeply discounted per minute rate.

25.   The alleged bribe payments were to be funneled to Mount Salem Management, located in the Turks and Caicos Islands, at the rate of 9 cents per minute indefinitely.

26.   IDT is subject to mandatory regulation from the Federal Communications Commission (hereinafter "FCC") as a condition of

its license to engage in international telecommunications pursuant to section 214 of the Communications Act of 1934.[1]

27.    The payment of 9 cents per minute violates the specific dictates of several FCC regulations promulgated under the Communications Act of 1934.

28.    More specifically, the only lawful rate for telephone traffic terminating in Haiti at the time was 23 cents per minute set by the FCC pursuant to it's International Settlements Policy ("ISP").

29.    In addition, the FCC, under its No Special Concessions Rules, prohibited any U.S. telecommunications carrier from negotiating any type of exclusive discounted agreement with a foreign dominant carrier which involved pricing, third party payment arrangements, or operational characteristics of the transaction.

30.    IDT's agreement with Mount Salem Management and Teleco Haiti violated the No Special Concessions Rules since other U.S. carriers were paying 23 cents directly to Teleco Haiti while IDT received the exclusive right to pay only 9 cents to a third party, Mount Salem Management.

31.    Further FCC regulation required IDT to fully disclose it's discounted price to the government, the public, and all competing

---

[1] This complaint makes extensive reference to FCC regulations. Counsel and the court are respectfully referred to the extensive motion practice dealing with these regulations which resulted in the unsealing of the pricing information in the complaint.

U.S. carriers so that those carriers could gain the benefit of the discounted rate.

32.   IDT failed to inform its competitors and the FCC of its discounted rate.

33.   Other FCC regulations required IDT to seek prior regulatory approval of it's deeply discounted 9 cent rate since its competitors were paying 23 cents.

34.   IDT failed to seek any form of regulatory approval of it's discounted rate.

35.   The United States Foreign Corrupt Practices Act also prohibited unlawful bribe payments, directly or indirectly, to foreign government officials, for the purpose of obtaining or retaining business.

36.   During the entire course of his employment, plaintiff was never once reprimanded, censured, disciplined, suspended or cited for violating any company policy, nor was he ever charged with misconduct, nor was the quality of his work performance criticized or characterized as "unsatisfactory".

37.   The plaintiff was however terminated by IDT on November 11, 2003, shortly after IDT management discovered plaintiff had become aware that representatives from Mount Salem Management and Teleco Haiti signed the agreement.

38.   On or about November 12, 2003, in order to receive his final accrued earnings and vacation pay, plaintiff was asked to sign a Separation Agreement, Waiver and Release prepared by IDT which sought, amongst other things, plaintiff's waiver of his right to prosecute any local, state or federal anti-discrimination claim against IDT.

39.   The plaintiff refused to sign the agreement.

40.   By correspondence dated November 13, 2003, the plaintiff requested a written explanation of the reasons for his termination, a copy of his personnel file, and the preservation of the data on his computer.

41.   To date, IDT has completely failed to respond to plaintiff's requests.

42.   After plaintiff was terminated, IDT forwarded a letter to the New Jersey Department of Labor indicating that his termination was for cause predicated on misconduct.

43.   This correspondence triggered the scheduling of a fact finding hearing by the New Jersey Department of Labor to determine if the plaintiff engaged in gross misconduct at IDT.

44.   By letter dated December 2, 2003, the plaintiff's attorney responded to IDT's accusations by indicating in writing to the New Jersey Department of Labor that the termination was for his objections to IDT's unlawful business practices as set forth above.

45.   IDT received a copy of this correspondence which fully outlined the above referenced unlawful conduct.

46.   On December 4, 2003, The New Jersey Department of Labor held the hearing, found in plaintiff's favor and granted full unemployment benefits.

47.   Notwithstanding IDT's receipt of the letter from plaintiff's counsel, and its full explanation of the unlawful nature of the subject transaction, IDT management intentionally proceeded with the Mount Salem Management/Teleco Haiti deal.

48.   Plaintiff's discharge was predicated upon plaintiff's objections to IDT's unlawful business practices and the civil and/or potential criminal liability IDT management faced if the details of their unlawful, unethical and corrupt business practices were to be exposed.

49.   The true grounds underpinning plaintiff's discharge turn on the facts and circumstances described above, not the disingenuous, unsupported and uncorroborated contrivances manufactured by IDT management.

## FACTUAL BACKGROUND OF THE SUPPLEMENTAL CAUSES OF ACTION.

50.   Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, IDT installed equipment in Haiti and the United States for purposes of facilitating a criminal transaction involving theft of telephone

service from the People of the Republic of Haiti and the obtaining of an unlawful market advantage over it's competitors.

51. Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, IDT began passing such telephone traffic to Teleco Haiti in February of 2004.

52. Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, IDT made payments to Mount Salem Management for this telephone traffic from February 2004 through April of 2004.

53. Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, IDT paid Mount Salem Management nine cents per minute.

54. Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, with the assistance of attorney Adrian Corr, paid Teleco Haiti only six cents per minute and not the nine cents per minute set forth in the agreements between IDT and Mount Salem Management and Teleco Haiti.

55. Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, with the assistance of Mount Salem attorney Adrian Corr, retained three cents per minute as a bribe payment to benefit the former President of Haiti, Jean Bertrande Aristide.

56.    Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti Mount, in April of 2004, shortly after the IDT learned that plaintiff filed the within lawsuit and reported this matter to the authorities, IDT ceased making payments to Mount Salem Management and immediately asked Teleco Haiti to bill it directly for minutes being sent to Haiti.

57.    Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, Teleco Haiti was unaware that IDT was paying nine cents a minute to Mount Salem Management and thought instead that IDT was paying only six cents per minute.

58.    Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, IDT failed to inform Teleco Haiti of the nine cent deal it negotiated with Mount Salem Management and therefore Teleco Haiti only billed IDT six cents per minute for calls sent to Haiti by IDT.

59.    Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, IDT knew that Mount Salem was improperly retaining three cents per minute as a means of funneling bribe payments to President Jean Bertrande Aristide.

60.    Upon information and belief, based upon a published complaint by the Government of the Republic of Haiti, after April 2004 IDT only paid six cents per minute to Teleco Haiti for phone calls it sent to that country which is also a violation of the FCC's International Settlements Policy.

61.    By motion dated May 3, 2004, IDT, and all the individual IDT defendants moved to seal, on "trade secret" grounds, over 33 paragraphs of the complaint and amended complaint in this matter containing the following information:

a.    The name of the customer with whom IDT has negotiated the business agreement, Teleco Haiti;

b.    The dollar amounts of the deposit, per minute rate for terminating traffic in Haiti, per minute settlement rate, per minute agent's fee, and cost savings to IDT; and

c.    The specific terms and negotiations of the agreement.

62.    By affidavit dated May 3, 2004, Nadine Duhamel, an in house IDT attorney, filed an affidavit in support of IDT's motion to the seal portions of the complaint and amended complaint.

63.    In that affidavit, Nadine Duhamel portrayed the U.S./Haiti telecommunications market as competitive by stating:

"IDT conducts business both domestically and internationally.    The success of IDT is based on favorable negotiations of business deals, which it does by underbidding competitors and targeting customers that are simultaneously the targets of IDT competitors. Thus, the amount of harm caused by the disclosure of

confidential and proprietary information contained in plaintiff's complaint is enormous."

"IDT will lose its competitive advantage once its competitors learn how it structures and negotiates its contracts, especially the rate structure."

64.    In reality the Haiti route was highly regulated by the Federal Communications Commission (hereinafter "FCC") in that there was no competition since all carriers were required to pay the same rate per minute for phone calls being transmitted to Haiti.

65.    In that same affidavit, Duhamel stated that IDT keeps secret the companies with which it is doing business by stating:

"IDT maintains confidentiality with respect to details of business arrangements with certain companies in terminating telecommunication traffic and, in some cases, the companies themselves with whom IDT is conducting business.    IDT does so because it considers such information to be proprietary and to maintain a competitive advantage within the industry."

66.    In reality under mandatory FCC ISP regulations in existence in 2003 and 2004 IDT was required to publicly file their contract information with respect to the applicable international service, the name of the foreign telecommunications administration, the present per minute rate (including any surcharges), the new proposed lower rate (including any surcharges), the effective date, and the division of any accounting rates.

67.    In that same affidavit Duhamel stated:

"IDT does not disclose the fact that it does business with Teleco Haiti including in any of its required filings."

68.    In reality, FCC International Settlements Policy (ISP) contract filing regulations required IDT to notify the FCC of it's agreement with Mount Salem Management and Teleco Haiti.

69.    Ms. Duhamel wrote and swore to the contents of her affidavit, knowing of the false nature of her claims, with an intent to deceive the court and the plaintiff into sealing the complaint, to cover-up and conceal unlawful conduct of IDT and preserve an unlawful agreement, and to hinder the prosecution of plaintiff's civil case herein.

70.    Ms. Duhamel wrote and swore to the contents of her affidavit, knowing of the false nature of her claims, for the purpose of traumatizing the plaintiff and setting the stage for the imposition of ruinous financial sanctions against the plaintiff and his counsel in order to make it impossible for plaintiff to proceed with his case and to break his will to continue.

71.    Ms. Duhamel wrote and swore to the contents of her affidavit, knowing of the false nature of her claims, notwithstanding the fact that IDT and it's senior executive management publicly acknowledged IDT's regulatory obligations

under the FCC's International Settlements Policy in it's 2003 and

2004 SEC 10-K filings:

"In addition, as a condition of our Section 214 authorization, **we are subject to various reporting and filing requirements**. Failure to comply with the FCC's rules could result in fines, penalties, forfeitures or revocation of our FCC authorization, each of which could have a material adverse effect on our business, financial condition, and results of operation."

"We must conduct our U.S.-originated international business in compliance with the FCC's International Settlements Policy, the rules that establish the parameters by which U.S.-based carriers and their foreign correspondents settle the cost of terminating each other's traffic over their respective networks. Under the FCC's International Settlements Policy, absent approval from the FCC, international telecommunications service agreements with dominant foreign carriers must be **non-discriminatory**, provide for settlement rates usually equal to one-half of the accounting rate, and require proportionate share of return traffic." (emphasis added).

"The FCC could find that we do not meet certain International Settlements Policy requirements with respect to certain of our foreign carrier agreements. Although the FCC generally has not issued penalties in this area, it has issued a Notice of Apparent Liability to a U.S. company for violations of the International Settlements Policy and it could, among other things, issue a cease and desist order, impose fines or allow the collection of damages if it finds that we are not in compliance with the International Settlements Policy. Any of these events could have a material adverse effect on our business, financial condition, or results of operation."

72.    Defendants Courter, Mason and Jonas signed the above 10-K statement acknowledging the applicability of the ISP to the agreement with Mount Salem Management and Teleco Haiti.

73.    By motion dated June 1, 2004, IDT and all the IDT individual defendants, **prior** to a decision on the sealing motion, filed a motion to sanction plaintiff and his counsel for refusing to agree to the sealing of the complaint.

74.    The purpose of filing the motion for sanctions was to cause emotional distress to plaintiff and to coerce him into withdrawing his complaint and re-filing it without the unlawful details of the Mount Salem Management/Teleco Haiti deal.

75.    The filing of the motion for sanctions was a perversion of the legal process in that it was designed to traumatize, coerce, oppress and intimidate the plaintiff into withdrawing his complaint and removing the details of the alleged unlawful nature of the agreement and payments between IDT and Mount Salem Management and Teleco Haiti.

76.    On July 6, 2004, the date set for oral argument on the sealing motion, counsel for IDT represented to the court that IDT was being harmed and blamed the plaintiff for the fact that Teleco Haiti is asking to renegotiate the discounted 9 cent rate IDT obtained through Mount Salem Management.

77.   In reality, on information and belief, based upon a published complaint from the Government of the Republic of Haiti, as of April of 2004, IDT had already gained a reduced rate of 6 cents per minute as set forth above.

78.   IDT thus attempted to mislead the court into believing that Mr. Jewett caused IDT to pay a higher rate when in reality they were paying less.

79.   By order dated August 6, 2004, in reliance on the representations of Ms. Duhamel and defense counsel, the court accepted IDT's arguments and sealed as "trade secrets" all pricing information in the complaint and amended complaint as well as the alleged deposit to be paid, the monthly cost savings to IDT, and certain legal advice given in furtherance of the transaction.

80.   The defendants knew they were not entitled to this relief since the FCC mandated regulatory approval and public disclosure of their discounted rate and payment scheme and that the payments constituted a bribe since the provisions of the Foreign Corrupt Practices Act required IDT to exercise due diligence and to take all necessary precautions to ensure that they had formed a business relationship with reputable and qualified partner and representative.

81.   The defendants thus knew their transaction was not a "trade secret" but a statutorily designated public record and unlawful payment under FCC regulations and U.S. and New Jersey criminal law.

82.   Notwithstanding the fact that the defendants knew they were not entitled to the relief as set forth above, they pursued a motion for sanctions in order to cause emotional distress to plaintiff and to punish him for not agreeing to the relief obtained.

83.   The pursuit of the motion for sanctions was a perversion of the legal process in that it was designed to traumatize, coerce, oppress and intimidate the plaintiff for revealing the alleged unlawful nature of the agreement and payments between IDT and Mount Salem Management and Teleco Haiti.

84.   The purpose of the sealing order and the sanctions motion was to cover-up and further conceal the unlawful transaction between IDT and Mount Salem Management and Teleco Haiti from IDT's competitors, shareholders, and the victimized people of Haiti.

85.   The purpose of the sealing order and the sanctions motion was to cause emotional distress to plaintiff and intimidate and punish him for not agreeing to sealing something that could not have been sealed as a matter of law.

86.    The purpose for the sanctions was to exhaust both plaintiff's and his counsel's resources making it impossible to continue with this case.

87.    In an article appearing in the Wall Street Journal dated October 9, 2004 a spokesperson for IDT stated:

IDT "takes any kind of complaint seriously" but that this one is a "baseless claim by a former disgruntled employee."

"There has already been "a complete review by the internal audit committee and by outside counsel."

IDT "intend[s] to file a counter-claim and a motion to dismiss" and that it has "filed sanctions against the plaintiff's counsel."

88.    Defendant James Courter made similar defamatory comments in the New York Times on October 1, 2005 by stating:

"The plaintiff is disgruntled and has no evidence."

89.    The purpose of the statements was to cause emotional distress to plaintiff and falsely discredit his claims and make it appear to the public and to IDT's investors that they have no merit and that the subject deal is perfectly legal.

90.    On October 14, 2004 IDT released its 2004 Annual 10-K filing with the SEC stating:

"On March 29, 2004, D. Michael Jewett ("Jewett"), a former employee whose employment we terminated less than seven months after he was first hired, filed a complaint against us in the United States District

Court, District of New Jersey following his termination. The complaint alleges (i) violations of the New Jersey Anti-Racketeering Statute; (ii) violations of the New"

"Jersey Conscientious Employee Protection Act; (iii) violations of the New Jersey Law Against Discrimination; (iv) Common Law Defamation; and (v) New Jersey Common Law Intentional Infliction of Emotional Distress. Jewett is seeking damages of $31 million, plus attorneys' fees. We deny the allegations contained in the complaint. We intend to contest it vigorously and we have already moved to dismiss the complaint. **We have also sought sanctions against Jewett's attorney.** Jewett sent a copy of his complaint to the United States Attorney's Office because in his complaint, Jewett alleged, among other things, that improper payments were made to foreign officials in connection with an IDT Telecom contract. As a result, the Department of Justice, the Securities and Exchange Commission and the United States Attorney in Newark, New Jersey have initiated investigations with respect to this matter. The Company and the Audit Committee of our Board of Directors also initiated independent investigations, conducted by outside counsel, regarding certain of the matters raised in the Jewett complaint and in these investigations. **Neither the Company's nor the Audit Committee's investigation has found any evidence that we made any such improper payments to foreign officials.** (emphasis added).

91.    The purpose of this statement was also to mischaracterize plaintiff's claims and make them appear baseless in several respects:

The 10-K statement incorrectly portrays the lawsuit as one requiring proof of payment to a foreign official when in reality the whistleblower aspects of the case require no such proof.

The 10-K statement fails to inform investors that the NJ RICO action merely requires and agreement to make payments to a foreign official (a racketeering conspiracy) along with an act in furtherance of that

conspiracy (such as the termination of Jewett or other overt acts). No actual payments are required.

The 10-K statement fails to disclose that violations of FCC regulation embedded in the contract which plaintiff objected to, create an independent basis of liability under the NJ RICO and NJ CEPA causes of action.

The 10-K statement fails to disclose the other aspects of plaintiff's lawsuit alleging religious discrimination and practice at IDT.

92.     By letter dated February 4, 2005 plaintiff confronted defense counsel for IDT with a claim that IDT and all the individual IDT defendants obtained sealing of the complaint by fraudulently and knowingly concealing their regulatory obligations to publicly disclose the per minute price negotiated with Mount Salem Management and Teleco Haiti on the Haiti route under FCC ISP and No Special Concessions Rules.

93.     By letter dated March 1, 2005 counsel for IDT responded:

"Regardless of your position as to what IDT should or should not have done under **some FCC regulation**, IDT has always kept these rates confidential and has always treated them as confidential. As such, IDT was completely forthcoming with the Court when it stated that the information was, and continues to be, confidential proprietary information." (emphasis added).

94.     On March 2, 2005, plaintiff moved under FRCP Rule 60 to unseal the discounted price of 9 cents per minute since that relief was alleged to be obtained by fraud and misconduct.

95.     Throughout the time said motion was pending, IDT, and all the IDT individual defendants, continued to cover-up, conceal and mis-represent the mandatory regulation requiring full disclosure of the price and all the particulars of the Mount Salem Management/Teleco Haiti deal.

96.     On March 23, 2005, in opposition to plaintiff's unsealing application, defendant Alex Schwarz filed an affidavit offering his opinion that the contract between IDT and Mount Salem Management and Teleco Haiti, being a deal for one way transmission of telephone traffic, was not subject to mandatory FCC public disclosure regulation and hence should remain sealed:

> "My understanding is that the FCC regulations at issue in Mr. Jewett's motion to unseal is the FCC filing regulations which relate to and discuss reciprocal agreements. A reciprocal agreement is one where a telecommunication carrier is both sending and receiving traffic to a carrier as well [as] receiving back traffic from such carrier."

> "The Teleco Haiti deal did not entail IDT sending traffic as well as receiving traffic back from Teleco Haiti."

97.     In reality IDT was required to accept a proportionate share of return traffic under the FCC's International Settlements Policy, and, one-way deals, such as the one negotiated by IDT, violated FCC regulations prohibiting the acceptance by IDT of special concessions or exclusive arrangements from Mount Salem Management and Teleco Haiti.

98.   The sworn opinion offered by defendant Schwarz was an attempt to deceive the court into keeping the complaint sealed, to hinder the prosecution of plaintiff's civil case herein, and to cover-up and conceal from the public, the government, and IDT's investors, for as long as possible, an unlawful transaction.

99.   In a further effort to keep the pricing information sealed, the Vice Chairman and President of Carrier Services for IDT Telecom, defendant Jonathan Levy, filed an affidavit, dated March 24, 2005, in which he swore under oath, that:

> "IDT will be at a disadvantage relative to its competitors whose rate information is not disclosed to the public and thus not readily available to IDT."

> "Like IDT, its competitors do not publish their rate information."

> "It is for this very reason that IDT's competitors do not rate information."

> "They are not made available to the public or the press. They are not filed with the FCC and they are not given to IDT's competitors."

100.   In reality IDT's competitors, under mandatory FCC ISP guidelines, publish their rates each time they negotiate a new contract or a new rate below that being paid by other carriers.

101.   To prove this point and refute the claims of Mr. Levy, the plaintiff provided to defense counsel all the publicly filed contract information for all of IDT's competitors from 1996 through 2003 fully documenting the mandatory 23 cent rate.

102. Mr. Levy wrote and swore to the contents of his affidavit, knowing of the false nature of his claims, with an intent to hinder the prosecution of plaintiff's civil case herein, to assist IDT, and all IDT individual defendants herein, to deceive the court and the plaintiff, and to cover-up, conceal and suppress unlawful conduct of IDT, and the individual defendants herein, from the government, the public, and IDT investors.

103. After reading the plaintiff's papers filed to refute the claims of Jonathan Levy the defendants realized they were going to lose the unsealing motion and therefore asked for permission to file a motion for a "protective order."

104. The request was granted and by motion dated April 27, 2005, IDT and all the IDT individual defendants filed the motion seeking an order:

> Prohibiting plaintiff's counsel from communication with Judge Lifland regarding unethical conduct of defense counsel and/or in-house counsel for IDT.
>
> Prohibiting the plaintiff from communicating with the press and the government agencies investigating this matter including the Justice Department's ongoing criminal probe of this matter.
>
> Appointing an attorney to investigate plaintiff's counsel for alleged unethical conduct in exposing and disclosing the conduct of the defendants and their counsel.

105. Simultaneous with the filing for a protective order and without prior notice, the defendants sought severe sanctions for plaintiff's alleged communication with the press, counsel's actions in exposing the alleged fraudulent sealing order, as well as counsel's report of the entire alleged unlawful transaction to the Justice Department.

106. The purpose of filing the motion for a protective order and sanctions was to cause emotional distress to plaintiff and distract the court from the wrongs committed in sealing the complaint and to obtain an alternate improper ground for concealing the unlawful agreement by obtaining a all-embracing gag order prohibiting the plaintiff and his counsel from any and all communication with the press, Judge Lifland, and any government agency investigating this matter.

107. The purpose of the simultaneous filing for sanctions was also to exhaust the resources of the plaintiff and his counsel and to make it difficult or impossible to continue with the lawsuit.

108. On June 8, 2005, realizing that the complaint was going to be unsealed, fully revealing and exposing the unlawful nature of the agreement, the defendants asked for their motion for a "protective order," to be heard **prior** to the unsealing motion

notwithstanding the fact that the "protective order" motion was filed approximately 8 weeks after the plaintiff's unsealing motion.

109. The defendants thereby hoped to have the "protective order" in place, prohibiting disclosure of he unlawful details of the transaction, in anticipation of the court's unsealing of the complaint.

110. The defendants request was granted and the court agreed to hear the "protective order" motion on July 6, 2005 prior to hearing the motion to unseal.

111. On July 6, 2005, special counsel for IDT, a former Judge of this court, arguing in support of the "protective order" re-assured and promised the court that no misleading conduct had occurred when IDT asserted the price paid was a trade secret by stating:

> "Judge, I'm satisfied, you've litigated long enough, you've been on the bench long enough, you understand what fraud is and if there was any fraud being committed on you, you would yell at counsel."

> "Judge, **I submit any lawyer who stands before you and is foolish enough to attempt to dupe you to issue an order based on false statements or fraud on this court, knows that their license is at risk. It didn't occur.**" (emphasis added).

112. On July 6, 2005, the motion for a "protective order" was denied.

113. By July 18, 2005, the defendants, realizing their opposition to the unsealing motion was not going well, presented certain publicly filed Haiti rate information from the contracts of two of IDT's competitors, ATT and Sprint.

114. The defendants then argued that, although certain of IDT's competitors have publicly filed this contract information and sought regulatory approval of their rates, sometimes the contracts are filed late and not all contracts are filed.

115. By letter dated July 19, 2005, counsel for plaintiff responded to defense counsel's claims by explaining the ATT and Sprint filings as proper FCC approved retroactive filings of rate reductions on the Haiti route and supplying all the other publicly filed contracts on the Haiti route that counsel represented to the court as not being part of the public record.

116. On July 20, 2005, the date for oral argument, IDT unconditionally withdrew all opposition to the unsealing of the per minute price of 9 cents per minute negotiated with Mount Salem Management and Teleco Haiti and any further claim that the price negotiated with those entities constituted a "trade secret."

117. By order dated July 29, 2005 the court unsealed the previously sealed final negotiated price of 9 cents per minute.

## COUNT I - NEW JERSEY COMMON LAW DEFAMATION

118.  IDT stated, through a spokesperson, on October 8, 2004,

that:

IDT "takes any kind of complaint seriously" but that this one is a "**baseless claim by a former disgruntled employee**."

there has already been "a complete review by the internal audit committee and by outside counsel."

IDT "intend[s] to file a counter-claim and a motion to dismiss" and that it has "**filed sanctions against the plaintiff's counsel.**"

119.  IDT made similar defamatory statements in its SEC 10-K

filing dated October 14, 2004 as follows:

"On March 29, 2004, D. Michael Jewett ("Jewett"), a former employee whose employment we terminated less than seven months after he was first hired, filed a complaint against us in the United States District Court, District of New Jersey following his termination. The complaint alleges (i) violations of the New Jersey Anti-Racketeering Statute; (ii) violations of the New Jersey Conscientious Employee Protection Act; (iii) violations of the New Jersey Law Against Discrimination; (iv) Common Law Defamation; and (v) New Jersey Common Law Intentional Infliction of Emotional Distress. Jewett is seeking damages of $31 million, plus attorneys' fees. We deny the allegations contained in the complaint. We intend to contest it vigorously and we have already moved to dismiss the complaint. **We have also sought sanctions against Jewett's attorney**. Jewett sent a copy of his complaint to the United States Attorney's Office because in his complaint, Jewett alleged, among other things, that improper payments were made to foreign officials in connection with an IDT Telecom contract. As a result, the Department of Justice, the Securities and Exchange Commission and the United States Attorney in Newark, New Jersey have initiated investigations with respect to this matter. The Company and the Audit Committee of our Board of Directors also initiated independent investigations, conducted by outside counsel, regarding certain of the matters raised in the Jewett complaint and in these investigations. Neither the

Company's nor the Audit Committee's investigation has found **any evidence** that we made any such improper payments to foreign officials.

120. Defendant James Courter made the same defamatory statements in an article appearing in the New York Times on October 1, 2005 as follows:

**"The plaintiff is disgruntled and has no evidence."**

121. The defamatory statements have been republished on the internet.

122. The defamatory statements concerned plaintiff.

123. The defamatory statements were false.

124. The purpose of the statements was to discredit the plaintiff and publicly and professionally harm his reputation.

125. The purpose of the statements was to intimidate the plaintiff into withdrawing his case.

126. The statements were intended to convey the position that the plaintiff has fabricated his claims against IDT since he is merely a "disgruntled" employee with "baseless" claims.

127. The statements were meant to communicate that plaintiff's case is false and frivolous since IDT is filing for "sanctions against plaintiff's counsel."

128. The statements were meant to indicate the plaintiff has lied in his complaint since IDT claimed it had fully investigated the matter and had found "no evidence" to support Mr. Jewett's claims

notwithstanding IDT's knowledge and possession of clear and convincing evidence of wrongdoing in the company.

129.   The statements portray the plaintiff as a liar.

130.   The purpose of the statements was to mislead the public and IDT's investors:

> a.   By mis-characterizing the nature of plaintiff's claims by indication that actual payments to foreign officials were required when the law has no such requirement.
>
> b.   By telling the public that IDT has a valid claim to sanction counsel.
>
> c.   By failing to reveal that IDT unlawfully concealed its contract information with Mount Salem Management and Teleco Haiti and failed to seek FCC approval of Upon information and belief, IDT and all named defendants were aware that all or a portion of the payments to Mount Salem would be offered, given, or promised, directly or indirectly, to a foreign official, foreign political party, candidate, or official for the purposes of assisting IDT in obtaining or retaining a telecommunications business relationship with TeleCo Haiti.

131.   The statements were designed to mischaracterize plaintiff's accusations to make them appear baseless.

132.   The defamatory statements were made while knowing that the unlawful misconduct of IDT, it's agents, servants, and employees, continued after plaintiff's discharge as outlined above.

133.   The defamatory statements were made while knowing that plaintiff's claims were not baseless since that IDT, it's agents, servants, and employees, planned and executed a pattern of

unlawful conduct designed to violate FCC rules, gain an improper market advantage, and bribe a foreign official.

134. The defamatory statements were made while knowing that IDT, it's agents, servants, and employees, employees were engaged in a pattern of cover-up activity to conceal the above referenced unlawful conduct from the public and the court.

135. The defamatory statements were made while knowing that the misconduct of IDT, it's agents, servants, and employees, employees continued after plaintiff's discharge as outlined above.

136. The defamatory statements were communicated to someone other than plaintiff, to wit: any potential employers, the plaintiff's family and friends and the general public reading the Wall Street Journal and the New York Times, newspapers of general circulation in the United States and around the world; and reprints of the above articles; and the general public reading SEC filings.

137. The above named defendants made the defamatory statements (1) with actual knowledge that the statements were false, or (2) with reckless disregard of the statement's truth or falsity, or (3) with negligence.

138. The statements injured the reputation of plaintiff or exposed him to hatred, contempt, humiliation and/or ridicule.

139. The statements caused plaintiff to lose the goodwill, respect and confidence of others.

140.  The statements were designed to discredit the plaintiff in an effort to conceal and continue an unlawful transaction from the government, the public and from IDT's investors.

141.  The statements injured the plaintiff in his trade or business.

142.  As such the plaintiff is entitled to damages to his reputation, his ability to earn a living, and for punitive damages since the statements were made with an improper motive and to actually harm the plaintiff.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

143.  IDT and all the IDT individual defendants engaged in a course of conduct set out above which involved publishing statements on October 8, 2004 in the Wall Street Journal, on October 1, 2005 in the New York Times, and on October 14, 2004 in IDT's SEC 10-K filing, which are ruinous and injurious to the reputation and character of the plaintiff.

144.  The statements characterize plaintiff's claims and baseless and false.

145.  The defendants are aware that they obtained the price from Mount Salem Management and Teleco Haiti by unlawful means by violating FCC regulations and Federal and New Jersey State Criminal Laws.

146.  The defendants were aware that they were bribing a foreign official.

147. The defendants thus knew their statements were false and that the plaintiff's claims are not baseless and are in fact fully supported by law and fact.

148. The defendants made the statements intentionally and to produce emotional distress.

149. The statements were extreme and outrageous in that they were made in public filings and newspapers of general worldwide circulation knowing of its falsity and crushing impact on plaintiff's professional and personal reputation.

150. The defendants also embarked on a campaign of unlawful litigation conduct with no proper basis in fact and law as set forth above.

151. The purpose of the conduct was to intimidate the plaintiff and place him in fear of the payment of ruinous court ordered sanctions and legal fees.

152. The defendants proceeded with a litany of bad faith motion practice with the purpose of breaking plaintiff's will to continue in the case by means of ruinous financial and legal sanctions.

153. The statements and conduct were be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

154. The plaintiff was severely traumatized by the conduct involved in his termination and the subsequent actions of IDT in denying him the reasons for his termination and claiming before the New Jersey Department of Labor that he was fired for cause.

155. The plaintiff was severely traumatized by the public statements of IDT and the bad faith and unlawful litigation conduct set out above.

156. The plaintiff has experienced constant anxiety and frequent feelings of being insecure, tense, strained, ill at ease, upset, dissatisfied, frightened, lacking confidence, being nervous, jittery, indecisive, unable to relax, discontented, worried, confused, unpleasant, and ruminating over possible misfortunes.

157. The plaintiff has experienced and continues to experience depression and upset over the fact that his career was ruined by the actions of the defendants in conspiring to fabricate and continuing to fabricate false reasons for his termination for which he has sought medical treatment.

158. The plaintiff has difficulty sleeping while he thinks about his future prospects since the defendants falsely fired him for cause and the fact that his termination, and the reasons therefore, must be disclosed to any prospective employer.

159. The defendants' statements were the proximate cause of plaintiff's emotional distress.

160. The emotional distress suffered by plaintiff was so severe that no reasonable person should be expected to endure such distress.

161. The conduct of the defendants was sufficiently severe to cause genuine and substantial emotional distress or mental harm to the average person.

162. As such the plaintiff is entitled to damages for the emotional distress caused by this outrageous conduct.

## JUDGMENT AND DAMAGES

WHEREFORE, plaintiff demands judgement in his favor on the above referenced causes of action along with monetary damages including attorney's fees. Punitive damages are also specifically demanded along with any other and further relief the court deems appropriate including an injunction against all the defendants prohibiting further damage to the good name of the plaintiff.

Dated:      Staten Island, New York
January 11, 2006

## TRIAL BY JURY

Plaintiff hereby demands trial by jury on all issues.

_____
William P. Perniciaro-WPP-8670.
Attorney for Plaintiff
Staten Island, New York 10306
Tel.718.667.5000
Fax 718.667.0798