UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| D. MICHAEL JEWETT,<br><br>              Plaintiff,<br><br>v.<br><br>IDT CORPORATION; HOWARD S. JONAS; MOTTI LICHTENSTEIN; JACK LERER; DAVID SCHROPFER; AVI LAZAR; ROBERT SCHIFF; MICHAEL LEVINE; JONATHAN LEVY; ALEX SCHWARZ; JAMES A. COURTER; JOYCE MASON; JOHN CATE; ADRIAN CORR; MOUNT SALEM MANAGEMENT LTD.; AND JOHN DOE numbers one through ten, fictitious names, real names being unknown, representing the entities or individuals who engaged in unlawful racketeering practice; who deprived plaintiff of earnings and who subjected him to unlawful employment discrimination as set forth herein,<br><br>              Defendants. | Civil Action No. 04-01454 (SRC/MAS)<br><br>*Document Electronically Filed*<br><br>**DEFENDANTS IDT CORPORATION AND DAVID W. SCHROPFER, JR.'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO FED. R. CIV. P. 56.1 AND LOCAL CIV. R. 56.1(a)** |

       Defendants IDT Corporation and David W. Schropfer, Jr. (collectively, "IDT" or "Defendants"), by and through their undersigned counsel, McElroy, Deutsch, Mulvaney & Carpenter, LLP, submit the following Statement of Undisputed Material Facts ("SOUMF") in support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.1 and Local Rule 56.1(a):

**A.    The Remaining Parties**

       1.      Plaintiff D. Michael Jewett is currently a resident of Bluffton, South Carolina and was an at-will employee of IDT Corporation from April 15, 2003 until November 11, 2003. [Pl.

Tr. 12:19-22 and Pl. Tr. 132:25 – 133:4, attached as Exhibit A to the Certification of J. Michael Riordan ("Riordan Cert.")]

2. Defendant IDT Corporation, through its telecommunications subsidiary, IDT Telecom, Inc., is engaged in the business of providing both domestic and international voice and calling card services. [Pl. Tr. 90:7-21, attached as Ex. A to Riordan Cert.]

3. At all relevant times, Defendant David W. Schropfer, Jr. ("David Schropfer") was the Senior Vice President for Strategic Management for IDT. [Id. at 40:18-41:12]

4. As Senior Vice President, David Schropfer's primary duty was to increase the number of profitable interconnects between IDT and foreign Post Telephone & Telegraph Companies ("PTTs") as well as to maintain relationships after an interconnect was developed [Schropfer (May 13, 2009) Tr. 13:13–17, attached as Ex. B to Riordan Cert.]

5. Other than this suit, David Schropfer has never been the subject of any claim or suit alleging discrimination or retaliatory discharge. [Certification of David W. Schropfer, Jr. ("Schropfer Cert."), ¶ 2].

## B. Plaintiff's Background Prior to Joining IDT

6. In the 23 years prior to his joining IDT, Plaintiff had been employed with twelve (12) different companies in five (5) different industries. [Pl. Dep. Tr. 177:11 – 207:2; Dep. Ex. Jewett-3, attached as Exs. A and E, respectively, to Riordan Cert.]

## C. Plaintiff's At-Will Employment with IDT

7. By letter dated March 26, 2003, IDT (based on David Schropfer's decision) offered Plaintiff at-will employment as Regional Director of the Caribbean. [See the March 26, 2003 offer letter marked as Dep. Ex. Jewett-11, attached as Ex. F to Riordan Cert.; see also Schropfer Cert. ¶ 4]

8.	Plaintiff accepted IDT's offer and on April 15, 2003 commenced at-will employment with IDT as an Associate Regional Vice President for the Caribbean ("ARVP"). [Ibid.]

9.	At all relevant times, Plaintiff was an employee-at-will of IDT, i.e., Plaintiff could quit his employment with IDT or IDT could terminate Plaintiff's at-will employment at any time, with or without cause. [Pl. Tr. 383:17- 384:1, Ex. A to Riordan Cert.]

10.	Plaintiff acknowledged his at-will employment on April 15, 2003 by executing the Acknowledgment and Receipt of the IDT Employee Handbook which, states, in pertinent part, that:

> I understand that my employment is at-will and as such, employment with IDT Corporation is not for a fixed term or definite period. I understand that my employment may be terminated by me or the Company at any time, with or without cause. I further understand that nothing contained in the handbook may be construed as creating a promise of future benefits or a binding contract with IDT Corporation for benefits or for any other purpose."

[Dep. Ex. Jewett-13; Dep. Ex. IDT-36; Pl. Tr. 440:6-16, attached as Exs. H, G and A, respectively, to Riordan Cert.]

11.	Plaintiff was employed as an ARVP for the Caribbean on a probationary basis from April 15, 2003 through July 15, 2003. [Dep. Ex. Jewett-11, attached as Ex. F to Riordan Cert.]

12.	On or about July 15, 2003, Plaintiff was offered full-time, at-will employment with IDT as an ARVP for the Caribbean. [Schropfer (May 13, 2009) Tr. 87:22 – 89:22; Dep. Ex. Schropfer-9, attached as Exs. B and L, respectively, to Riordan Cert.]

13. David Schropfer made the decision to retain Plaintiff when his three-month probationary period ended. [Schropfer (May 13, 2009) Tr. 87:22 – 89:22; Dep. Ex. Schropfer-9, attached as Exs. B and L, respectively, to Riordan Cert.]

14. Plaintiff was responsible to create, build, and grow relationships IDT had with PTT's and other Tier-1 Carriers, including closing new deals with such entities. [Pl. Tr. 99:14-24, attached as Ex. A to Riordan Cert.]

15. At all times during his employment with IDT, Plaintiff reported solely to David Schropfer, who was Plaintiff's only supervisor. [Schropfer (May 13, 2009) Tr. 82:11-12, attached as Ex. B to Riordan Cert.]

16. During Plaintiff's employment, he was assigned certain responsibilities for several accounts (i.e., TSTT, Cable & Wireless Jamaica, Cable and Wireless Panama, TeleBermuda, PRTC, Batelco and Telemovil) including interfacing with those accounts and assisting IDT to close deals with those accounts. [Pl. Tr. 275:20 – 280:13, attached as Ex. A to Riordan Cert.]

17. Plaintiff represented that he had "strong connections" with at least two of the carriers in the Caribbean. [Id. at 18:2-9]

**D.    The Relevant IDT Policies**

18. On April 15, 2003, Plaintiff acknowledged his receipt of the IDT Employee Handbook. [See Dep. Ex. Jewett-13, attached as Ex. H to Riordan Cert.]

19. The IDT Employee Handbook confirmed IDT's commitment to Equal Employment Opportunity, including for individuals of all creeds and religions. [Dep. Ex. IDT-36, p. 6, attached as Ex. G to Riordan Cert.]. In addition, the Employee Handbook contains an Anti-Harassment and Non-Discrimination Policy which describes in detail the IDT Complaint

Procedure an employee should utilize if they have any complaint, including one involving harassment, discrimination or retaliation. [Id. at pp. 7-9]

20. On December 11, 2002, the Board of Directors of IDT adopted IDT's policy regarding the Foreign Corrupt Practices Act ("FCPA"). [See Dep. Ex. Schropfer-87, attached as Ex. I to Riordan Cert.]

21. On June 3, 2003, the IDT Board of Directors adopted the IDT Code of Business Conduct and Ethics ("Code of Conduct") which specifically incorporates by reference and reiterates IDT's FCPA policy prohibiting, inter alia, unlawful payments to governmental personnel. The Code of Conduct also encourages employees to report any alleged illegal or unethical behavior and details how to make a complaint or report of a violation. [See Dep. Ex. Schropfer-88, attached as Ex. J to Riordan Cert.]

22. During his employment with IDT, Plaintiff never submitted a written complaint of discrimination or any alleged unlawful conduct by Defendants pursuant to IDT's complaint procedure in the IDT Employee Handbook, Code of Conduct or otherwise. [Schropfer Cert., ¶ 10].

### E. Plaintiff's Failure to Achieve His Projections and Other Performance Issues

23. When Plaintiff was hired, Mr. Schropfer expected that Plaintiff could assume ownership of accounts, i.e., handle all aspects of the IDT client relationship through and including the closing of a deal. However, shortly after Plaintiff commenced employment with IDT, Plaintiff demonstrated that he lacked the ability to perform at that level [Schropfer (May 14, 2009) 88:1-16, attached as Ex. B to Riordan Cert.]

24. As ARVP for the Caribbean Region, Plaintiff's training focused on reviewing and revising various marketing proposals. [Pl. Tr. 78:12–25, attached as Ex. A to Riordan Cert.]

25. Mr. Schropfer hoped that with training Plaintiff would be able to assume "ownership" of accounts. Yet, Plaintiff never demonstrated the ability to do so. [Schropfer (May 14, 2009) Tr. 88:1-16, attached as Ex. B to Riordan Cert.].

26. In May 2003, Plaintiff attended a Global Telecom Management meeting so that he could obtain access to carriers. Prior to that meeting, Plaintiff had only communicated with one carrier, TeleBermuda. [Pl. Tr. at 79:3 - 90:6, attached as Ex. A to Riordan Cert.]

27. At David Schropfer's request, on July 9, 2003, Plaintiff submitted his projections for fiscal year 2004, August 1, 2004 to July 31, 2005. Plaintiff projected that he would have two (2) new contracts signed during the 1st quarter; three (3) new contracts signed during the 2nd quarter; and two (2) new contracts signed during the 3rd quarter. Plaintiff did not project any new contracts for the 4th quarter. [Id. at 978:17 – 980:10; see also Jewett-200, attached as Exs. A and K to Riordan Cert.]

28. Plaintiff admitted that David Schropfer advised Plaintiff that his performance evaluation as well as any bonus determination would be based upon his performance against his projections. [Pl. Tr. 980:9-15, attached as Ex. A to Riordan Cert.]

29. As of his termination, the deals Plaintiff projected to close in the 1st quarter of 2004 (i.e., PRTC and BATELCO) had not closed. [Pl. Tr. 997:20 – 998:25, attached as Ex. A to Riordan Cert.] Nor had Plaintiff closed any other deals. [Dep. Ex. Schropfer-3, attached as Ex. D to Riordan Cert.]

30. In addition to failing to achieve any of his objective performance goals, Plaintiff was also the subject of other performance-based complaints by David Schropfer and other IDT employees who interacted with Plaintiff. [See Dep. Ex. Schroper-3, attached as Ex. D to Riordan Cert.]

31. For example, on several different occasions prior to Plaintiff's November 11, 2003 termination, Jonathan Levy, David Schropfer's supervisor, questioned David Schropfer as to why Plaintiff was being retained given his poor performance. [See Dep. Ex. Schropfer-3, attached as Ex. D to Riordan Cert.]

32. On July 16, 2003, David Schropfer reprimanded Plaintiff for his lack of knowledge regarding C&W Panama's decision to downsize capacity. [See Dep. Ex. Schropfer-32 and Schropfer (May 14, 2009) Tr. 123:22 – 125:23, attached as Exs. M and B, respectively, to Riordan Cert.]

33. On July 24, 2003, Plaintiff was assigned to assist Mr. Lerer with respect to the Telemovil deal. Plaintiff testified that Mr. Lerer became "upset" about plaintiff's work with respect to the Telemovil deal and criticized Plaintiff to Mr. Schropfer. [Pl. Tr. 397:13 – 399:7, attached as Ex. A to Riordan Cert.].

34. On September 18, 2003, Jack Lerer sent an e-mail to Plaintiff advising that Plaintiff was sending the wrong information to the wrong person in connection with the Teleco Haiti deal. David Schropfer reprimanded Plaintiff for sending inaccurate information and for pushing his work off on Mark Litarowich in connection with the TelecoHaiti deal. [Dep. Ex. Schropfer-82 and Schropfer (May 19, 2009) Tr. 90:3 – 91:4, attached as Exs. N and B, respectively, to Riordan Cert.]

35. On September 23, 2003, Jack Lerer sent an e-mail to David Schropfer complaining about Plaintiff. David Schropfer again reprimanded Plaintiff for his failure to keep Jack Lerer apprised and for his practice of pushing his work off on others. [Dep. Ex. Schropfer-59, attached as Ex. O to Riordan Cert.]

36. In a November 10, 2003 e-mail to Plaintiff, David Schropfer attached Plaintiff's reported "actual results" for the 1st quarter of 2004, crossing out several materially overstated production numbers submitted by Plaintiff. Plaintiff reported total net added value of $2,854,253 and total minutes of 167,324,526; the actual net added value was $1,634,302 and the actual total minutes were 74,504,750. [Deposition Exhibit Schropfer-22, attached as Ex. U to Riordan Cert.] As a result, Mr. Schropfer reprimanded Plaintiff for having "totally inaccurate" productivity numbers. [Schropfer (May 14, 2009) Tr. 38:9 - 41:3, attached as Ex. B to Riordan Cert.]

37. David Schropfer testified that "it was pretty evident … that [plaintiff] was going to get a zero out of three in terms of his projections for new interconnection agreements." [Schropfer (May 13, 2009) Dep. Tr. 108:24 – 109:7, attached as Ex. B to Riordan Cert]. David Schropfer testified that he informed plaintiff: "There's no way you get a bonus if you get zero on a projection, no greater than zero, because it was the most important number." [Ibid.]. David Schropfer elaborated:

> Mr. Jewett was nowhere close to earning a bonus and I told him that. It was almost mathematically impossible to earn a bonus – let me rephrase that, since he didn't own any of his deals when the first quarter was in progress I made it very clear to him that he wasn't – he didn't own his accounts and calculating his bonus would have been virtually impossible. We still did his planning, and did the math on the actual numbers but your question is about Mr. Jewett's bonus and I made it very clear to him he wasn't in the running for that, he wasn't going to be until he was owning his own accounts and he wasn't relying on me to help him run his accounts or other people to step in and help him do parts of his job, great parts of his job.

[Schropfer (May 14, 2009) Tr. 102-16 to 103-6, attached as Ex. B to Riordan Cert.]

38. David Schropfer also testified that Plaintiff "did not understand the [deal] profile which was one of the central tools of his job." David Schropfer testified that there were "remarkable" errors in one profile presented by Plaintiff to David Schropfer. Furthermore, even

after editing by David Schropfer, Plaintiff's second draft still had many errors. This was the "cause of one of very many reprimands [David Schropfer] gave to [plaintiff]." [Schropfer (May 13, 2009) Tr. 152-25 to 153-7, attached as Ex. B to Riordan Cert.]

39. David Schropfer testified in deposition that none of the other individuals Mr. Schropfer supervised required the kind of support Plaintiff needed. "I did not have anybody else that needed the kind of support he needed to do the basic functions of managing an account." [Schropfer (May 14, 2009) Tr. 105:11-22, attached as Ex. B to Riordan Cert.]

40. On or about July 9, 2003, David Schropfer allowed Plaintiff to reduce his projections to two (2) Projected New Contracts for the Fiscal Year 1st Quarter for 2004. [Dep. Ex. Jewett-200, attached as Ex. K to Riordan Cert.]

41. By Plaintiff's own admission, Plaintiff had not accomplished any of his projections, even as reduced by David Schropfer, as of his termination. [Pl. Tr. 997:20 – 999:8, attached as Ex. A to Riordan Cert.]

42. Plaintiff was the only IDT Vice President reporting to David Schropfer who could not handle accounts on his own. [Schropfer (May 14, 2009) Tr. 87:8-20, attached as Ex. B to Riordan Cert.]

**F. The Termination of Plaintiff's At-Will Employment for a Legitimate, Non-Discriminatory and Non-Retaliatory Reason**

43. Prior to his termination, Plaintiff had commenced undisclosed efforts to obtain employment outside IDT. [Pl. Tr. 207:21 - 209:22 and Dep. Ex. Jewett-158; attached as Exs. A and Z, respectively, to Riordan Cert.]

44. On or around November 7, 2003, David Schropfer made the decision to terminate Plaintiff's at-will employment for a legitimate, non-discriminatory and non-retaliatory reason he conveyed to Plaintiff, i.e., poor performance. [Schropfer (May 13, 2009) Tr. 134:8 – 135:17;

Deposition Exhibit Schopfer-11 and Deposition Exhibit 13, attached as Exs. B, R and S, respectively, to Riordan Cert.]

45. On November 11, 2003, David Schropfer met with Plaintiff and advised Mr. Jewett that his at-will employment with IDT was being terminated due to Plaintiff's failure to achieve his projections and other performance issues. [Pl. Tr. 388:3 – 393:1 and Schropfer (May 13, 2009) Tr. 139:21 - 153:25, attached as Exs. A and B, respectively, to Riordan Cert.].

46. During the termination meeting, Plaintiff admitted that he had not closed any of the projected deals (i.e., PRTC, Cable & Wireless Jamaica and TeleBermuda) which David Schropfer referenced during the termination meeting. [Pl. Tr. 997:20 – 998:25, attached as Ex. A to Riordan Cert.].

47. During his employment with IDT, Plaintiff never filed a Charge or Complaint of discrimination or retaliation nor die he ever threaten to do so. [Schropfer Cert. ¶ 11]

48. The fact that Plaintiff is not Jewish played no role in the termination decision; David Schropfer also is not Jewish. [Schropfer Cert. ¶ 12]

49. As of the time David Schropfer made the decision to terminate Plaintiff's employment, he did not believe Plaintiff had made any complaint about solicitations for Jewish charitable organizations, the Teleco Haiti deal or any other allegedly unlawful conduct. [Id. at ¶ 10]

### G. The IDT-Teleco Haiti Carrier Service Agreement

50. In or about May 20, 2003, Jack Lerer (Executive Vice President for International Business Development of IDT) advised others at IDT about the possibility of IDT negotiating a Carrier Service Agreement with Teleco Haiti wherein at Teleco Haiti's request, Mont Salem Management would act as a third party administrator to perform certain functions on behalf of

Teleco Haiti (the "CSA"). [Pl. Tr. 521:12 – 522:8 and Schwarz Tr. 72:8 – 73:24, attached as Exs. A and C, respectively, to Riordan Cert.]

51.  Plaintiff's role relative to the proposed CSA including acting as a liaison and send the draft agreements back and forth between IDT and Teleco Haiti and Mont Salem. [Pl. Tr. 275:3-6, attached as Ex. A to Riordan Cert.]

52.  During the period from June 2003 until the termination of his employment with IDT, Plaintiff was copied on emails disclosing the status of the IDT-Teleco Haiti negotiations and he circulated proposed drafts of the CSA. [i.e. Dep. Exs. Jewett-45 and Jewett-72, attached as Ex. Y, respectively, to Riordan Cert.]

53.  At no time did Plaintiff state in any email or other document that the proposed CSA violated or would violate the law in any manner or was otherwise criminal or fraudulent. [Pl. Tr. 599:13-21, attached as Ex. A to Riordan Cert.]

54.  Plaintiff admitted that he did not bring any concerns he may have had regarding the Teleco Haiti negotiations or CSA to the attention of any member of IDT's Legal Department: "At that point in time, you know, you don't want to cry wolf." [Id. at 568:16-21]

55.  Plaintiff admitted he never asked anyone in the IDT Legal Department to research Mont Salem's role in the transaction, testifying at this deposition: "That's not my job". [Id. at 578:5-8]

56.  Plaintiff admitted he did not object to his supervisor, David Schropfer (or anyone else in management at IDT), about his participation in the Teleco Haiti negotiations. Instead, he testified that he thought the deal would not go through: "I figured that somebody in legal would put the cabash on the deal as it was being structured…" [Id. at 579:18-24]

57. Plaintiff testified that in his discussion with his supervisor David Schropfer (on September 16, 2003). Plaintiff only asked "whether the deal was legal or not." [Pl. Tr. 604:19-605:9; Ex. A to Riordan Cert.]

58. Subsequently, in one of Plaintiff's last written communications concerning the proposed CSA, (an e-mail dated September 19, 2003) Plaintiff responded to a request by Alex Schwarz, Esq. (of IDT Legal) for Plaintiff's feedback regarding the draft CSA Plaintiff stated:

> If IDT orders the circuits for interconnection on Company's behalf, the charges shall be: one-hundred twenty-five ($125) dollars per DS-1 circuit that can be used off an existing IDT DS-3; and two-hundred fifty ($250) dollars per stand-alone DS-1. This can be removed…this applies to domestic local loop interconnects…not international interconnects. <u>Other than that I am fine.</u>"

[Dep. Ex. Jewett-51, attached as Ex. P to Riordan Cert.] [Emphasis added]

59. Plaintiff admitted that the only thing he thought was unusual about the CSA was that Mont Salem was controlling all aspects of the deal but he does not recall raising an issue about that with anyone. [Id. at 644:12-20]

60. Plaintiff admitted that he did not express any concerns in his October 2003 conversation with David Schropfer wherein he alleges David Schropfer said that "IDT liked to fly under the radar" (meaning that IDT did not file CSA's with the Federal Communications Commission). [Pl. Tr. 515:9-12, attached as Ex. A to Riordan Cert.]

61. On October 20, 2003, Plaintiff sent an e-mail to Alex Schwarz and Jack Lerer regarding the final documents for the Teleco Haiti deal in which Plaintiff stated: "Please prepare the final documents for Mount Salem and Teleco and forward them for signature. Any questions…let me know." [Dep. Ex. Jewett-110, attached as Ex. Q to Riordan Cert.]

62. On October 22, 2003, Plaintiff e-mailed the "final" documents regarding the CSA to Mr. Duperval and Mr. Corr. [Pl. Tr. 651:2 – 14, attached as Ex. A to Riordan Cert.]

63. Neither Alex Schwarz nor John Cate ever mentioned to Plaintiff that they raised any of the "concerns" Plaintiff alleges he expressed to them with David Schropfer or anyone else in management at IDT. [Id. at 618:11-19]

**H. The Absence of Any Protected Conduct by Plaintiff**

64. As of the termination of Plaintiff's at-will employment with IDT, Plaintiff had never alleged to David Schropfer (or to Mr. Schropfer's knowledge to anyone else in management at IDT or in IDT's Human Resources Department) that:

    a. David Schropfer or anyone else at IDT had discriminated or threatened to discriminate against Plaintiff based on Plaintiff's religion or any other alleged protected status;

    b. David Schropfer or anyone else at IDT had engaged in or was threatening to engage in any violation of law; or that

    c. David Schropfer or anyone else at IDT had directed Plaintiff to engage in any violation of law. [See Schropfer Cert. ¶¶ 9-11]

65. As of the termination of his at-will employment with IDT, to David Schropfer's knowledge, Plaintiff had never:

    a. filed or threatened to file a Charge or Complaint of discrimination against IDT;

    b. testified or threatened to testify against IDT regarding any alleged discrimination; or

    c. assisted any other individual to file a Charge or Complaint of discrimination against IDT. [Id.]

66. As of the termination of Plaintiff's employment with IDT, to David Schropfer's knowledge, Plaintiff had never:

a. complained in writing to anyone at IDT in Human Resources, the Legal Department or in an supervisory position over Plaintiff that anyone at IDT had violated or threatened to violate the law;

b. complained verbally to anyone at IDT in Human Resources, the Legal Department or in a supervisory position over Plaintiff that anyone at IDT had violated or was threatening to violate the law; or

c. objected to or refused to participate in the CSA. [Id.]

## I. The Absence of Direct Evidence of Any Discriminatory or Retaliatory Conduct Towards Plaintiff

67. Plaintiff has never alleged that his supervisor, David Schropfer, made any discriminatory or retaliatory comment to or about Plaintiff; in fact, David Schropfer never made any such comment. [Id. at ¶12]

68. On the one occasion when Plaintiff discussed with David Schropfer that he (Plaintiff) was receiving solicitations from charitable organizations, David Schropfer told Plaintiff that he received solicitations too and to "just ignore them" and that "If it's troubling you, and if there's anything I can do about it, I'd be happy to ask if there's a list I can get you off of, or if there is any action that I could take." [Schropfer (July 15, 2009) Tr. 188:21 – 189:11, attached as Ex. B to Riordan Cert.]

69. In that discussion, Plaintiff told David Schropfer that he did not want him to take any action at that time with regard to the solicitations. [Id. at 189:14-18]

70. Plaintiff actually contributed to a "Jewish" charity brought to his attention by Jonathan Nierenberg. [Pl. Tr. at 158:12 to 159:23, attached as Ex. A to Riordan Cert.]

71. Further, Plaintiff admitted in deposition that most of the solicitations were sent subsequent to his termination from IDT. [Pl. Tr. 163:16-21, attached as Ex. A to Riordan Cert.]

72. When asked at his deposition, Plaintiff could not provide any support for his allegation that any discussion he had regarding the charitable solicitations played any part in his termination. [Pl. Tr. 173:11 -174:4, attached as Ex. A to Riordan Cert.]

73. Plaintiff admitted that he had no knowledge that any other non-Jewish employee of IDT who failed to contribute in response to, or complained about, solicitations by charitable solicitations was ever subjected to any adverse employment action. [Id. at 174:1 to 176:11]

### J. Any Statements by IDT About Plaintiff to the New Jersey Department of Labor Were Truthful and Privileged

74. On November 9, 2003, Plaintiff submitted an application to the New Jersey Department of Labor for unemployment benefits. [Documents produced by the New Jersey Department of Labor (sans communication between Plaintiff and his counsel), attached as Ex. U to Riordan Cert.]

75. IDT's only communication with the Department of Labor was through a Human Resources representative who responded to a telephonic inquiry by the Department of Labor. The Human Resources representative, Sonia Sousa, stated: "He [Jewett] was terminated for performance. <u>There was no misconduct involved</u>." [See excerpts of Deposition Exhibit Jewett-1 (the Department of Labor file sans communications between Plaintiff and his counsel) and Pl. Tr. 130:8 to 137:18, attached as Exs. U and A, respectively, to Riordan Cert.] [Emphasis and explanatory material added]

76. In granting Plaintiff's application, the NJDOL expressly stated that IDT had represented that Plaintiff had been terminated for "poor job performance" but "failed to elaborate." [See page 2 of the Record of Telephone Fact-Finding Interview and Determination, marked as a portion of Ex. U to Riordan Cert.]

77. Plaintiff admitted in deposition that he has no knowledge that Defendants ever made any defamatory statement about him to the Department of Labor. [Pl. Tr. 139:24 to 140:11, attached as Ex. A to Riordan Cert.]

78. Plaintiff was never denied unemployment benefits by the Department of Labor. [Id. at 132:14-19]

### K. Plaintiff's Failure to Mitigate

79. Plaintiff testified that following his termination by IDT he did not actively pursue any job search until 2005 allegedly because he had a two (2) year post-employment restraint in his IDT Agreement. [Pl. Tr. 231:3 – 10, attached as Ex. A to Riordan Cert.]

80. In or about March 15, 2004, Plaintiff and his wife formally opened their own executive recruitment business (which they had taken steps to form prior to Plaintiff's termination). [Id. at 207:21 – 213:23]

81. Plaintiff operated his executive recruitment business until December 2007 when he voluntarily terminated the business. [Id. at 218:15 – 23]

82. Plaintiff admitted that from 2004 to 2007, he never attempted to obtain any other employment or income. [Id. at 226:25 – 227:4]

83. Subsequent to 2007, Plaintiff employed the services of Career Pro, a placement agency based out of North Carolina. [Id. at 231:3 – 10]

84. In March 2008, Plaintiff commenced his professional relationship with Cora Bett Thomas Realty. [Id. at 242:9 – 25]

85. Plaintiff voluntarily terminated his relationship with Cora Bett in May 2008. [Id. at 242:9 – 243:11]

86. Since voluntarily terminating his relationship with Cora Bett, Plaintiff has not hired or communicated with any other recruitment agency nor has he participated in a single job interview. [Id. at 503:6 – 504:12]

### L. Plaintiff Has Not Suffered Any Non-Economic Damages

87. In his submissions to the NJDOL for unemployment benefits, Plaintiff consistently represented that he was able to work. [See Ex. U to Riordan Cert.]

88. Plaintiff has not submitted any expert report opining that he has suffered from any emotional distress or psychological condition due to this employment at IDT and the time in which to do so has expired. [Riordan Cert. ¶ 28]

89. Plaintiff has never produced any petition for Workers' Compensation benefits relating to his employment with IDT. [Riordan Cert. ¶ 29]

90. Plaintiff testified that he visited a general practitioner ("GP") relating to his emotional distress and that while Plaintiff's GP referred him to a psychiatrist, Plaintiff never reported to that physician despite his GP's referral. [Pl. Tr. 239:19 – 241:12, attached as Ex. A to Riordan Cert.]

91. Other than during the period when Plaintiff was treated for prostrate cancer, he has never alleged that he was unable to work due to any medical condition or symptom. [Kincaid Tr. 117:18 – 118:6, attached as Ex. X to Riordan Cert.]

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
Attorneys for Defendants
IDT Corporation and David Schropfer

By: *[signature]*
J. Michael Riordan, Esq.

Dated: February 25, 2010