**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

\----------------------------------------------------------- X
                                        :
D. MICHAEL JEWETT,                    :
              Plaintiff,         :
                                      :       04-CV-1454 (SRC)
                  v.              :
                                      :
IDT CORPORATION, *et*           :
*al.*,                                 :
              Defendants.       :
                                      :
\----------------------------------------------------------- X

**Expert Report of Kent D. Bressie**

TABLE OF CONTENTS

I.    Introduction ............................................................................................. 1

     A.  Scope of Engagement ...................................................................... 1

     B.  Professional Qualifications ............................................................. 1

     C.  Federal Rules of Civil Procedure Information ................................ 2

     D.  Materials Reviewed ........................................................................ 3

II.   Summary of Opinions ............................................................................ 3

III.  Opinions .................................................................................................. 4

     A.  Under the FCC Regulations in Effect During the Period Relevant to This Case,
         U.S. Carriers Were Required to File With the FCC Any and All Agreements
         Entered Into With Foreign Carriers With Respect to the Exchange of Services,
         Routing of Traffic, and Rates, Among Other Matters. .................... 4

     B.  IDT Corporation Was Required to File With the FCC Its Contract with Teleco
         Haiti and Any Amendments Thereto. .............................................. 9

     C.  No Exemption Justified IDT's Failure to File with the FCC its Agreement with
         Teleco Haiti .................................................................................... 12

         1.  FCC Regulations Required IDT To File Because IDT Was a "Carrier" and
             Teleco Haiti Did Not Qualify for the Presumption that It Lacked Market
             Power in Haiti. .......................................................................... 12

         2.  FCC Regulations Did Not Exempt "Interim" Agreements From Filing
             Requirements. ............................................................................ 13

             a.   Any FCC Policy Exempting "Interim" Agreements from the ISP
                  Filing Requirements Existed Only After June 2004 and Was Specific
                  to the U.S.-Philippines Route.................................................. 13

             b.   IDT's 2003 Agreement with Teleco Haiti Predates the So-Called
                  Interim Agreement Exception, Which Was Not Retroactive................... 15

             c.   Even If Such A Policy Had Applied During the Period Relevant in
                  This Case, the Policy Would Have Been Void as a Matter of Law
                  Under the Administrative Procedure Act.................................... 16

             d.   The 2003 Agreement Was Not Interim in Nature.................... 17

     D.  IDT Conceded It Violated Federal Law and the FCC's Regulations When It
         Entered a Consent Decree With the FCC and Agreed to Pay a $400,000 Penalty
         and Institute Compliance, Training, and Reporting Programs. .................. 19

IV.   Conclusion .......................................................................................... 21

## I.   INTRODUCTION

### A.   Scope of Engagement

I have been retained on behalf of D. Michael Jewett ("Jewett" or "Plaintiff") to provide

an opinion on the following issues regarding Federal Communications Commission ("FCC")

regulatory obligations for the purposes of this proceeding:

> Whether FCC regulations in force between September 2003 and
> November 2004 required IDT Corporation ("IDT") to file with the FCC a
> copy of the 2003 Carrier Services Agreement ("2003 Agreement") it
> entered into with Télécommunications d'Haïti S.A.M. ("Teleco Haiti")—
> and file with the FCC and serve on other carriers subsequent amendments
> thereto—covering the routing of traffic, accounting rates, or the settlement
> of traffic balances, unless an exception established in Section 43.51
> applies.

I will address this issue below.

### B.   Professional Qualifications

My analysis and conclusions are based upon my experience as a lawyer in private

practice representing U.S. and foreign companies, investors, governments, and others in the areas

of telecommunications regulation and international trade and investment.

I have practiced with my current firm of Wiltshire & Grannis LLP ("W&G," formerly

known as Harris, Wiltshire & Grannis LLP) for 11 years, the last eight as a partner.  Most of my

practice has been long devoted to the international telecommunications sector, where I regularly

provide advice and representation relating to:  U.S. and foreign telecommunications licensing;

compliance with U.S. and foreign regulatory reporting, contract filing, and other disclosure

requirements (including the FCC's regulations regarding international settlement rates and its

International Settlements Policy); interpretation of international treaties governing international

telecommunications services (including international settlement and accounting rates);

negotiation of commercial telecommunications agreements (including capacity purchase and

correspondent agreements); investment; and market access issues.  I have long represented a

variety of service providers and network owners involved in the provision of international

telecommunications, and much of that work has related to the Caribbean Basin region.

Prior to joining W&G, I was an associate in the telecommunications practice group in the

Washington, D.C. office of Gibson, Dunn & Crutcher LLP, from 1997 to 1998, at which time

our practice group left to form what is now W&G.  I was also an associate in the international

department and the telecommunications practice group at Steptoe & Johnson LLP ("Steptoe")

from 1994 to 1997.  Much of my telecommunications-related work at Steptoe related to the

FCC's regulations governing international settlement rates.

I obtained my law degree from the University of Chicago Law School in 1994.  I

obtained my undergraduate degree with distinction from Stanford University in 1991.

My professional biography and curriculum vitae are appended in Exhibit A.

## C.    Federal Rules of Civil Procedure Information

My current billing rate for expert work is 575 dollars per hour.  My compensation is not

contingent upon the results in this case, whether by settlement or by trial.  Neither my law firm,

nor I, has any economic interest in any of the parties or the subject of this litigation with respect

to which my analysis, report and testimony may be based.  Included in my curriculum vitae,

attached in Exhibit A, is a list of publications authored by me during the last ten years.  In 2007,

I testified as an expert witness on behalf of 360networks Corporation both at deposition and at

trial with respect to the final disputed claim in the bankruptcy of Asia Global Crossing Ltd.[1]  I

was deposed regarding issues of U.S. and Japanese telecommunications regulation.  The

---

[1]    *In re Asia Global Crossing Ltd., et al.*, Nos. 02-BR-15749 & 02-BR-15750 (Bankr. S.D.N.Y.
2007).

bankruptcy court accepted into evidence my report on both subjects, and I testified at trial about matters involving Japanese telecommunications regulation.

This report has been prepared as of the date set forth below and represents my analysis and conclusions as of that date.  It may be affected and supplemented by additional information and analysis developed in the course of preparation for trial.

### D.    Materials Reviewed

The transaction documents and discovery materials I reviewed in preparing this report are listed in Exhibit B.  The additional research materials I reviewed in preparing this report are listed in Exhibit C.

## II.    SUMMARY OF OPINIONS

In my professional opinion, between September 2003 through November 2004—the time period relevant to this case—IDT was required by FCC regulations to file with the FCC the 2003 Agreement and the four amendments thereto within 30 days of execution, and IDT's failure to comply with these filing and service requirements violated federal law and FCC regulations.  It is my professional opinion that no "interim agreements" exception to this filing requirement excused legally IDT's failure to comply with the FCC's filing and service requirements.  In my professional opinion, the so-called interim agreements exception articulated by the FCC in June 2004 was specific to the U.S.-Philippines route and was not retroactive to October 2003.  Even had it applied to the 2003 Agreement, it is my professional opinion that the so-called interim agreements exception was otherwise void as a matter of law under the Administrative Procedure Act.  Moreover, had such a valid exception existed, it is my professional opinion that it would not have excused IDT's failure to file the 2003 Agreement and amendments thereto, which were not interim in nature.  Finally, it is my professional opinion that IDT conceded that it violated

federal law and FCC regulations when it entered an FCC consent decree finding that IDT had

been required to file the 2003 Agreement and failed to file and serve on other carriers the

subsequent amendments, that IDT had failed to do so, and that IDT had agreed to pay a $400,000

financial penalty and comply with reporting and compliance plan obligations as a consequence

of its violations of the Communications Act of 1934, as amended, and the FCC's regulations.

## III.   OPINIONS

### A.   Under the FCC Regulations in Effect During the Period Relevant to This Case, U.S. Carriers Were Required to File With the FCC Any and All Agreements Entered Into With Foreign Carriers With Respect to the Exchange of Services, Routing of Traffic, and Rates, Among Other Matters.

The FCC regulates telecommunications services in the public interest, seeking to ensure

reasonable and non-discriminatory offerings of services, adequate facilities, and competitive

provision of services, to the benefit of U.S. consumers.[2]  With respect to international

telecommunications services, the FCC has long restricted preferential deals between U.S. and

foreign carriers that could harm consumers through higher rates.[3]  To enforce these restrictions

and ensure transparency in the market for telecommunications services, the FCC requires U.S.

carriers operating in the U.S. market to file certain contracts and agreements with the FCC,

where competing carriers and interested members of the public can review them.  The FCC's

International Settlements Policy ("ISP") illustrates this regulatory framework in the context of

international calls.[4]

---

[2]   47 U.S.C. §§ 151, 201-203.

[3]   *See*, *e.g.*, 47 C.F.R. §§ 43.51, 64.1001-64.1002 (setting forth the International Settlements Policy); *id.* § 63.18(e) (setting for requirements for *international simple resale*); *id.* § 63.14 (setting for the "no special concessions" rule).

[4]   *See id.* §§ 43.51, 64.1001.

Most U.S. carriers historically have not owned network facilities in foreign countries.  To enable U.S. customers to call or receive calls from residents of those foreign countries, U.S. carriers have entered into agreements (often known as "carrier service agreements" or "correspondent agreements") with carriers in those countries for the exchange of telecommunications traffic.  Under such agreements, the foreign carrier terminates calls originated by the U.S. carrier's customer, so that the U.S. customer may communicate with the foreign carrier's customer.  Similarly, the U.S. carrier terminates calls originated by the foreign carrier's customer, so that the foreign customer may reach the U.S. carrier's customer.

The U.S. and foreign carrier each incur costs when terminating calls for the other carrier. Consequently, carriers typically keep records of the volume of traffic they originate and terminate, which they use to seek periodic reimbursement from each other in the event that one carrier terminates more traffic than the other.  Two rates figure in this reimbursement.  The first is the "accounting rate," which represents the cost of a one-minute telephone call between two particular countries.  Under FCC regulations, carriers split the cost of a call evenly between them, effectively pretending that each provided exactly one-half of the support to the call.  The "settlement rate" is one-half of the accounting rate, and represents each carrier's portion of the cost of the call.[5]

The ISP is a longstanding FCC policy that regulates how U.S. carriers negotiate with foreign carriers to exchange international telecommunications traffic.[6]  The FCC adopted the ISP in response to concerns that foreign carriers with market power are able to take advantage of competition between multiple U.S. carriers serving a particular market to benefit at the expense

---

[5]   *See 2000 Biennial Regulatory Review, Report and Order*, 16 FCC Rcd. 10,647, 10,657 ¶ 15 n.44 (2001).

[6]   47 C.F.R. § 43.51.

of those carriers and of U.S. consumers.[7]  The FCC "established the ISP to prevent foreign

carriers with market power from discriminating, or using threats of discrimination or other

anticompetitive actions against competing U.S. carriers" in order to obtain price concessions

from the U.S. carriers.[8]  Simply put, the ISP ensures that U.S. carriers compete with each other

on a level playing field in the international calling market.  This, in turn, protects U.S. consumers

from paying artificially inflated prices for international calls.

        The ISP was in force during the time period relevant to this case, and it applied to the

U.S.-Haiti route for international calls until November 4, 2004.[9]  Then, as now, the ISP placed

three conditions on the ability of a U.S. carrier to enter into an agreement with a foreign carrier

to exchange international call traffic.  *First*, all U.S. carriers must be offered the same rates as of

the same date (nondiscrimination).  In other words, one carrier may not enter an agreement to

pay $0.10 per call terminated in the foreign country if its competitors are not offered the same

rate as of the same effective date.  *Second*, U.S. carriers must receive a share of U.S.-inbound (or

"return") traffic that is proportionate to their share of U.S.-outbound traffic (proportionate

return).[10]  That is, a U.S. carrier that generates 60 percent of traffic between the U.S. and the

foreign country must receive 60 percent of traffic from the foreign country to the U.S.  *Third*, the

accounting rate must be divided evenly (50-50) between U.S. and foreign carriers for U.S.–

inbound and –outbound traffic so that inbound and outbound settlement rates would be identical.

---

[7]     *See International Settlements Policy Reform*, Notice of Proposed Rulemaking, 17 FCC Rcd.
        19,954, 19,956-60 ¶¶ 2-6 (2002); *see also Implementation and Scope of the Uniform
        Settlements Policy for Parallel International Communications Routes*, *Report and Order*, 2
        FCC Rcd. 1118 (1987); *Further Reconsideration*, 3 FCC Rcd. 1614 (1988).

[8]     *In re IDT Corporation, Notice of Apparent Liability for Forfeiture*, 23 FCC Rcd. 10,805,
        10,806 ¶ 2 (2008) ("*IDT Liability Notice*").  This practice is known as "whip-sawing."  *Id.*

[9]     *See* 47 C.F.R. § 43.51 (2003); *Additional U.S.-International Routes Exempted from the
        International Settlements Policy*, *Public Notice*, 19 FCC Rcd. 22,032, 22,035 (2004).

[10]    47 C.F.R. § 43.51(e)(1) (2003).

Combined, these three conditions create a unified bargaining position for U.S. carriers when negotiating with foreign carriers that possess market power, such as national monopoly carriers. The ISP thus prevents one carrier from working out a secret "sweetheart" deal and undercutting its rivals and driving international calling prices up artificially for U.S. consumers.

To ensure that agreements between U.S. and foreign carriers conform to the ISP, the FCC's regulations require U.S. carriers to file with the FCC contracts and other arrangements for the exchange of international telecommunications traffic between the U.S. carrier and foreign carriers.[11]  For the period relevant to this case, the FCC's regulations specifically required U.S. carriers that entered contracts, agreements, or amendments, among others, with foreign carriers concerning the exchange of services, routing of traffic, rate and other matters to file a copy of each such contract or agreement with the FCC within thirty days of execution.[12]  Any carrier intending to implement an arrangement that offered terms different from those made available to any other carrier serving the same U.S.-international route likewise had to be filed with the FCC as a "modification request."[13]  A copy of the document itself had to be filed with the FCC.[14]  If the agreement was not in writing, the FCC's regulations required at least one of the parties to the agreement to file a certified statement stating all the details of the agreement.[15]

If a U.S. carrier enters an agreement with a foreign carrier that "differs from the arrangement in effect in the operating agreement of another carrier providing service to or from

---

[11]  47 C.F.R. 43.51 (2003); *see also Rules and Policies on Foreign Participation in the U.S. Telecommunications Market, Report and Order and Order on Reconsideration*, 12 FCC Rcd. 23,891, 24,007 ¶ 259 (1997).

[12]  47 C.F.R. § 43.51(a)(1) (2003).

[13]  *Id.* § 43.51(e) (2003).  *See also IDT Liability Notice*, 23 FCC Rcd. at 10,807 ¶ 4 & n.14 (discussing same).

[14]  *Id.* § 43.51(a)(2) (2003).

[15]  *Id.*

the same foreign point, the carrier must file a modification request" under the ISP.[16] This rule serves to create transparency in the market and prevents one U.S. carrier from obtaining a better settlement rate than another U.S. carrier at the expense of those other U.S. carriers and U.S. consumers who would have to pay artificially high calling rates. In its modification request, IDT would have had to state that it had not bargained for, and had no knowledge of, the exclusive availability of its rate under the 2003 Agreement.[17] The FCC's regulations also would have required IDT to serve a copy of its modification request, including the new account rate, on all carriers providing identical or similar service.[18]

Over time, the U.S.-international telecommunications services market has become more competitive. The FCC consequently has relaxed its application of the ISP. In 2004, for example, the FCC lifted the ISP for all U.S.-international routes where U.S. carriers had negotiated termination rates with foreign carriers that fell below certain "benchmark" rates set by the FCC to align international settlement rates more closely with actual costs.[19] The FCC lifted the ISP on those routes because it determined that those markets were sufficiently competitive to justify being exempted from the ISP's regulatory framework. On November 4, 2004, the FCC lifted the ISP from the route between the United States and Haiti.[20] Consequently, *after* November 4, 2004, U.S. carriers were no longer required to file with the FCC every agreement or contract they entered into with a Haitian carrier.

---

[16]   *Id.* § 64.1001(b) (2003).

[17]   *See id.* § 64.1001(d)(1) (2003).

[18]   *See id.* § 64.1001(f) (2003).

[19]   *International Settlements Policy Reform*, *First Report and Order*, 19 FCC Rcd. 5709, 5723 ¶ 27 (2004) ("*ISP Reform Order*").

[20]   *Additional U.S.-International Routes Exempted from the International Settlements Policy*, *Public Notice*, 19 FCC Rcd. 22,032, 22,035 (2004). *See also IDT Liability Notice*, 23 FCC Rcd. at 10,809 ¶ 5.

**B. IDT Corporation Was Required to File With the FCC Its Contract with Teleco Haiti and Any Amendments Thereto.**

I understand that on or about October 22, 2003, IDT entered into the 2003 Agreement with Teleco Haiti that provided that Teleco Haiti would terminate IDT's traffic coming from the United States to Haiti.[21]   Additionally, I understand that on four occasions between February 5, 2004 and November 4, 2004, IDT and Teleco Haiti established or amended the rates that would apply to Teleco Haiti's termination of IDT's U.S.-originated traffic.[22]   The last of these rates became effective on August 1, 2004,[23] more than three months before the FCC lifted the ISP on the U.S.-Haiti route.  Teleco Haiti was, at all relevant times, a telecommunications provider presumed to possess market power on a route that was subject to the ISP.[24]

Under the FCC's regulations in effect in the period relevant to this case, IDT was required to file with the FCC the 2003 Agreement and all four rate amendments with Teleco Haiti.[25]   It was required to file because the agreement and subsequent amendments addressed the

---

[21]   *IDT Corporation*, *Consent Decree and Order*, 23 FCC Rcd. 15,619 ¶ 5 (2008) ("*IDT Consent Decree*"); *IDT Liability Notice*, 23 FCC Rcd. at 10,809 ¶ 7 & n.24 (citing Letter from Troy F. Tanner, Bingham McCutchen, Counsel for IDT Corp., to Marlene H. Dortch, Secretary, Federal Communications Commission, dated Mar. 1, 2007 (attaching Carrier Service Agreement between IDT and Télécommunications d'Haïti S.A.M., Oct. 22, 2003) ("*Tanner March 1 Letter*")).

[22]   *IDT Consent Decree*, 23 FCC Rcd. 15,622-623 ¶ 5; *IDT Liability Notice*, 23 FCC Rcd. at 10,809 ¶ 7 (citing Letter from Troy F. Tanner, Bingham McCutchen, Counsel for IDT Corp., to Helen Domenici, Chief, International Bureau, Federal Communications Commission, dated May 23, 2007 ("*Tanner May 23 Letter*")).

[23]   *IDT Liability Notice,* 23 FCC  Rcd. at 10,809 ¶ 7 (citing Letter from Troy F. Tanner, Bingham McCutchen, Counsel for IDT Corp., to Helen Domenici, Chief, International Bureau, Federal Communications Commission, dated May 23, 2007 ("*Tanner May 23 Letter*")).

[24]   *See International Bureau Revises and Reissues the FCC's List of Foreign Telecommunications Carriers that are Presumed to Possess Market Power in Foreign Telecommunications Markets*, *Public Notice*, 18 FCC Rcd. 2438 (2003).

[25]   *See* 47 C.F.R. § 43.51(a)(1) (2003).

routing of traffic from IDT to Telecom Haiti;[26] because the 2003 agreement and later amendments addressed how much IDT would pay Telecom Haiti to terminate U.S.-Haiti calls; and because the FCC had not exempted the U.S.-Haiti route from the ISP during the relevant time period.[27] Despite the FCC's longstanding ISP, IDT did not file with the FCC the 2003 agreement or any of the four subsequent rate amendments.  IDT likewise did not notify other carriers serving the U.S.-Haiti route or seek FCC approval, as required, before implementing or modifying the agreement and its amendments.[28]  Under Section 64.1001, if IDT had obtained in the 2003 Agreement a settlement rate from Teleco Haiti below the rate received by another U.S. carrier, then IDT would have been required to file a modification request with the FCC to be permitted to proceed with the lower rate.[29]  And this was in fact the case.  The FCC maintains a publicly-accessible database of these accounting rate change applications.  According to that database, AT&T filed a modification request in April 2003 seeking to reduce the prevailing accounting rate for the U.S.-Haiti route as of January 1, 2003 from $0.60 to $0.46.[30]  The FCC granted this request in May 2003.[31]  As the FCC later found,

> Because AT&T had filed a modification request with the Commission on
> April 22, 2003 disclosing its new accounting rates for the exchange of
> traffic with Teleco Haiti, IDT was, or should have been, aware that
> AT&T's rate was different from - indeed, higher than - the rate that IDT
> had negotiated with Teleco Haiti, and thus triggered IDT's obligation to

---

[26]  *See IDT Consent Decree*, 23 FCC Rcd. at 15,622-623 ¶ 5; *IDT Liability Notice*, 23 FCC Rcd. at 10,809 ¶ 7.

[27]  *IDT Consent Decree*, 23 FCC Rcd. at 15,622-623 ¶ 5 (citing *Tanner May 23 Letter*).

[28]  *IDT Consent Decree*, 23 FCC Rcd. at 15,622-623 ¶ 5.

[29]  *See* 47 C.F.R. § 43.51(e)(1) (2003).

[30]  *AT&T Application for Accounting Rate Change*, filed Apr. 22, 2003, http://licensing.fcc.gov/ibfsweb/ib.page.FetchAppPDF?attachment_key=313141.

[31]  Federal Communications Commission, International Bureau File System Database, http://licensing.fcc.gov/cgi-bin/ws.exe/prod/ib/forms/reports/swr030b.hts?set= (Search "File No.= ARC-MOD-20030422-00017").

file its own modification request, pursuant to sections 43.51(e) and 64.1001(b) of the Commission's rules.[32]

IDT would not have been able to keep confidential the rates, terms, and conditions of the 2003 Agreement.  Under Section 43.51, the FCC granted confidentiality to settlement rate agreements covering service on a rate exempted from the ISP only.[33]  The U.S.-Haiti route was not exempt from the ISP when the 2003 Agreement was executed or when IDT and Teleco Haiti agreed to the four rate amendments.[34] IDT thereby violated federal law and FCC regulations.

The FCC reached the same conclusion in an enforcement proceeding against IDT in 2008.  As part of that proceeding, on March 1, 2007, IDT finally submitted the 2003 Agreement with Teleco Haiti at the request of FCC staff.  IDT identified the rates established under the agreement on May 23, 2007, in response to a FCC request.[35]  The FCC found IDT apparently liable for a $1.3 million forfeiture for violating the Communications Act of 1934 and the FCC's regulations by "willfully and repeatedly failing to file with the Commission, within thirty days of execution, a copy of an agreement with [Teleco Haiti] and each of four amendments thereto."[36] In addition, the FCC found IDT apparently liable for failing to file modification requests for each of the four amendments to the agreement's rate schedule.[37]

---

[32]   *IDT Liability Notice*, 23 FCC Rcd. at 10,813 ¶ 17.

[33]   47 C.F.R. § 43.51(f)(1) (2003).

[34]   *See Additional U.S.-International Routes Exempted from the International Settlements Policy*, *Public Notice*, 19 FCC Rcd. 22,032, 22,035 (2004); *see also IDT Liability Notice*, 23 FCC Rcd. at 10,809 ¶ 5.

[35]   *Id.*

[36]   *IDT Liability Notice*, 23 FCC Rcd. at 10,805 ¶ 1.

[37]   *Id.*

C.   **No Exemption Justified IDT's Failure to File with the FCC its Agreement with Teleco Haiti.**

1.   **FCC Regulations Required IDT To File Because IDT Was a "Carrier" and Teleco Haiti Did Not Qualify for the Presumption that It Lacked Market Power in Haiti.**

As it did with this Court, IDT argued to the FCC that it was not required to file the Teleco Haiti agreement under the ISP.  The FCC's regulations provide exceptions to the filing requirement for U.S. companies that are not a "carrier" as described in the FCC's regulations, and for certain types of contracts.  Neither exception applies to IDT.  *First*, IDT is a "carrier" under Section 43.51 of the FCC's regulations.  That section requires

> a carrier … that is engaged in foreign communications and enters into a contract, agreement, concession, license, authorization, operating agreements or other arrangements and amendments thereto with a foreign carrier that does not qualify for the presumption … that it lacks market power on the foreign end of one or more of the international routes included in the contract[38]

to file with the FCC.  Telecom Haiti did not qualify for the presumption that it lacks market power on the foreign end of the U.S.-Haiti route in 2003.  It never has qualified for that presumption.[39]  *Second*, IDT's agreement with Teleco Haiti also did not fall within the filing exception in Section 43.51(c), as in effect during the relevant period in this case.  Section 43.51(c) provides that agreements other than those "related to communications with foreign or

---

[38]   47 C.F.R. § 43.51(b)(2) (2003).

[39]   *List of Foreign Telecommunications Carriers that are Presumed to Possess Market Power in Foreign Telecommunications Markets*, Public Notice, 14 FCC Rcd. 7038 (1999) (listing Télécommunications d'Haïti S.A.M.); *The International Bureau Revises and Reissues the Commission's List of Foreign Telecommunications Carriers that Are Presumed to Possess Market Power in Foreign Telecommunications Markets*, Public Notice, 18 FCC Rcd. 2438 (2003) (same); *The International Bureau Revises and Reissues the Commission's List of Foreign Telecommunications Carriers that Are Presumed to Possess Market Power in Foreign Telecommunications Markets*, Public Notice, 18 FCC Rcd. 11,073 (2003) (same); *The International Bureau Revises and Reissues the Commission's List of Foreign Telecommunications Carriers that Are Presumed to Possess Market Power in Foreign Telecommunications Markets*, Public Notice, 19 FCC Rcd. 20,385 (2004) (same).

overseas points" do not have to be filed with the FCC.  But IDT's contract for the routing and termination of U.S.-Haiti traffic is a contract related to communications with a foreign point.

2.   **FCC Regulations Did Not Exempt "Interim" Agreements From Filing Requirements.**

IDT also contends it was not required to file the agreement because IDT "believed [the agreement] fell under the Commission's policy of not requiring the filing of interim agreements under the International Settlements Policy."[40]  IDT based this belief on a 2004 FCC order in which the FCC stated that it "does not require carriers to file interim agreements under the ISP."[41]  As the FCC later concluded, such was not the case.

a.   **Any FCC Policy Exempting "Interim" Agreements from the ISP Filing Requirements Existed Only After June 2004 and Was Specific to the U.S.-Philippines Route.**

When IDT entered the Carrier Services Agreement with Teleco Haiti, no "policy" exempting "interim" agreements existed.  For the entire period relevant to this case, the FCC's regulations "unambiguously"[42] required U.S. carriers to file all international agreements covering traffic routing, accounting rates, or traffic settlement with the FCC unless an exception in Section 43.51 of the FCC's regulations applied.[43]  Section 43.51 did not include an exception for so-called interim agreements.[44]  The FCC's regulations never have included such an exception.

On May 13, 2004, while resolving a highly publicized dispute between U.S. and Philippine carriers, the FCC issued a decision that stated in a footnote that "interim" settlement

---

[40]   *IDT Liability Notice*, 23 FCC Rcd. at 10,812 ¶ 13 (quoting *Tanner March 1 Letter* at 1; *Tanner May 23 Letter* at 1-2).

[41]   *AT&T Corp. Emergency Petition for Settlements Stop Payment Order and Request for Immediate Interim Relief*, *Order on Review*, 19 FCC Rcd. 9993, 9995 ¶ 2 n.9 (2004) ("*AT&T Order on Review*").

[42]   *IDT Liability Notice*, 23 FCC Rcd. at 10,811 ¶ 11.

[43]   *See* part III.A. above.

[44]   47 C.F.R. § 43.51 (2003).

agreements need not be filed.[45]  The FCC repeated this statement, again in a footnote and without discussion, in an August 2005 decision.  In neither instance did the FCC cite any authority for this statement.[46]  Between August 2005 and July 2008, the FCC did not repeat in any published order, public notice, or report any suggestion that interim call termination settlement agreements need not be filed.

The U.S.-Philippine dispute arose in 2003 when six terminating carriers in the Philippines blocked incoming calls from AT&T and MCI because AT&T and MCI refused to agree to higher termination rates.  AT&T and MCI appealed to the FCC for assistance, and regulators in both countries were drawn into the dispute.  The FCC ordered U.S. carriers to stop making settlement payments to the six Philippine carriers.  Such a stop-payment order had been entered only once before, in a dispute on the U.S.-Argentina route in 1996.[47]  Responding to the FCC's action, the

---

[45]  *See AT&T Order on Review*, 19 FCC Rcd. at 9995 ¶ 2 n.9 (rejecting a U.S. carrier's request "that the Commission issue an order directing all U.S. carriers terminating traffic to the Philippines to make publicly available the accounting rates and settlement rates now in effect between those U.S. carriers" and the dominant Philippine carrier because "[t]he Commission does not require carriers to file interim agreements under the ISP"); *In re International Settlements Policy Reform, Order on Reconsideration and Order*, 20 FCC Rcd. 14,106, 14,113 ¶ 9 n.53 (2005) (stating that "Access also notes that because the Commission does not presently require carriers to file interim agreements under the ISP, the Commission cannot verify whether these negotiated interim rates exceed previously negotiated levels even if they are below the relevant benchmark. As we explained in the [*AT&T*] *Order on Review,* however, the Commission 'does not require carriers to file interim agreements under the ISP.' [*AT&T*] *Order on Review,* 19 FCC Rcd. at 9995, ¶ 2 n.9.  Because certain transparency issues arise with regard to interim agreements, we may examine the issue of such agreements at a later point." (parentheses omitted)).

[46]  The *Order on Reconsideration* cites the *AT&T Order on Review*, but no authority outside that dispute.  The *AT&T Order on Review* cites no authority whatsoever.

[47]  *See AT&T Corp. Proposed Extension of Accounting Rate Agreement for Switched Voice Service with Argentina*, File No. ISP-96-W-062, DA 96-378 (Mar. 18, 1996) (finding that "[t]his Commission will not allow foreign monopolists to undermine U.S. law, injure U.S. carriers or disadvantage U.S. consumers…. To enforce our law, and to protect U.S. carriers and consumers, we must order U.S. carriers providing direct facilities-based service to Argentina in correspondence with Telintar to suspend settlement payments to Telintar.").

Philippine telecommunications regulator ordered Philippine carriers to stop accepting

terminating traffic from U.S. carriers not paying the higher rate—meaning *all* U.S. carriers.  This

shut down the U.S.-Philippines route and became a major international incident.  Eventually, the

two governments resolved the dispute.  In doing so, the FCC issued the two decisions stating in

footnotes that so-called interim agreements need not be filed.  Nothing about these statements

suggested that the FCC was establishing an exception to the ISP for any route other than the

contested U.S.-Philippines route.

> **b.    IDT's 2003 Agreement with Teleco Haiti Predates the So-Called Interim Agreement Exception, Which Was Not Retroactive.**

Even assuming the so-called interim agreements exception extended more broadly than

the U.S.-Philippines route, it is my professional opinion that IDT could not rely on it to excuse

legally its failure to file the 2003 Agreement with the FCC, as the exception was not retroactive

to October 2003.  IDT and Teleco Haiti executed the agreement on October 22, 2003.[48]  In its

March 2007 letter filing with the FCC, IDT relied on the footnote in the 2004 *AT&T Order on*

*Review* to support its claim that it was not required to file the 2003 Agreement.[49]  But the Order

that IDT says it relied on was not issued until June 4, 2004.  IDT cannot rely on a statement

made in a footnote of an order that was adopted over six months *after* IDT executed the 2003

Agreement to justify its failure to file the agreement with the FCC.  Under the ISP, IDT had 30

days from the date the 2003 Agreement was signed to file it with the FCC.  IDT did not file the

---

[48]    *IDT Consent Decree*, 23 FCC Rcd. at 15,622-623 ¶ 5.

[49]    *IDT Liability Notice*, 23 FCC Rcd. at 10,812 ¶ 13 & n.46.

2003 Agreement—or the four subsequent amendments—until 2007, and then, only at the request of FCC staff.[50]

> ### c. Even If Such A Policy Had Applied During the Period Relevant in This Case, the Policy Would Have Been Void as a Matter of Law Under the Administrative Procedure Act.

In my professional opinion, any later FCC creation of such a "policy" in June 2004 was void as a matter of law because it did not comply with existing regulations or with the notice-and-comment requirements of the Administrative Procedure Act ("APA"). Consequently, it could not have excused IDT's non-compliance even if it had applied starting in October 2003, which it did not.

The APA requires administrative agencies, including the FCC, to engage in notice-and-comment rulemaking when creating new rules or making substantive changes to existing regulations.[51] Simply put, federal law requires the FCC to notify the public of its intention and to consider public comment before issuing a new rule or making a substantive change to an existing regulation. Two exceptions to this requirement exist. Notice and comment are not required when the agency issues an interpretative rule or a general statement of policy.[52]

In my professional opinion, neither of these exceptions applies here. The alleged "interim agreements" exception is not an interpretative rule because it substantively changes the FCC's regulations regarding the ISP filing requirement. And it is not a general statement of policy because it is not "announc[ing] what the agency seeks to establish as policy."[53] A general

---

[50] *IDT Consent Decree*, 23 FCC Rcd. at 15,622-623 ¶ 5; *IDT Liability Notice*, 23 FCC Rcd. at 10,808, ¶ 7.

[51] 5 U.S.C. § 553 *et seq*.

[52] 5 U.S.C. § 553.

[53] *See Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) (citation omitted).

policy statement is a nonbinding announcement about what the agency intends to do prospectively.[54]  If the FCC intended its footnote statements about interim agreements, they would not be legally binding and thus could not create a generally applicable exception to the ISP's filing requirements.

### d.      The 2003 Agreement Was Not Interim in Nature.

In my professional opinion, IDT's claim that it did not have to file an interim agreement fails on its face because there is nothing to suggest that the agreement was an "interim" agreement.  The record contains no evidence beyond IDT's statements that the 2003 Agreement was interim.  By its own terms, the 2003 Agreement is not temporary.  Section 3.1 of the 2003 Agreement provides that the agreement will be in force for an initial period of one year, and that thereafter it automatically will renew on a month-to-month basis unless either party provides thirty-days' written notice of termination.  Simply put, if neither IDT nor Teleco Haiti took action, the 2003 Agreement would be effective for perpetuity.

No evidence suggests that the 2003 Agreement represents an interim contract or a prelude to further negotiations, which was a key characteristic of the interim settlement agreements in the U.S.-Philippines dispute.  After the U.S. and Philippine carriers reached interim agreement in that dispute, they restored telecommunications service and continued negotiating towards a final agreement.[55]  The FCC's statement that further negotiations follow interim agreements reflects

---

[54]  *See*, *e.g.*, *Am. Bus Ass'n v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980).

[55]  *AT&T Order on Review*, 19 FCC Rcd. at 10,003 ¶ 44 (noting that "interim agreements" had led to restoration of circuits on the U.S.-Philippines route and that "negotiations toward a final agreement have resumed"); *In re AT&T Corp. Emergency Petition for Settlements Stop Payment Order and Request for Immediate Interim Relief and Petition of WorldCom, Inc. For Prevention of "Whipsawing" On the U.S.-Philippines Route*, *Order*, 18 FCC Rcd. 3519, 3523 ¶ 5 (2003) (interim agreements were entered into "in order to return to negotiations and restore circuits").

common-sense understanding of the meaning of the word "interim."[56] An "interim" agreement

represents only a stage on the way to a final agreement.

Moreover, the FCC has unambiguously and directly rejected IDT's claim that carriers are

not required to file "interim" agreements.  In July 2008, the FCC issued a Notice of Apparent

Liability against IDT Corporation for its "willful[] and repeated[] fail[ures] to file with the FCC"

the 2003 Agreement and proposed a forfeiture of $1.3 million.[57]  In a footnote in that notice, the

FCC explained its "practice regarding interim agreements" as

> limited and intended largely to keep U.S.-international circuits open when
> a U.S. carrier and its foreign correspondent are renegotiating expired rate
> agreements. Once service is disrupted due to inconclusive or failed
> negotiations, it becomes increasingly difficult for the parties involved to
> reach agreement, particularly where there is an ongoing dispute
> concerning amounts owed. The Commission's practice regarding interim
> agreements allows parties to continue negotiations while exchanging
> traffic at an agreed-upon interim rate, often the rate that has just expired.
> Once final agreement is reached, the parties typically "true-up" any
> difference between the interim and final rate. In light of these industry
> practices, requiring that interim terms be publicly filed with the
> Commission is unnecessary, and could hamper negotiations for the
> exchange of telecommunications traffic.[58]

The FCC found, however, that "IDT has offered no evidence of ongoing negotiations

with Teleco Haiti that support its characterization of the Carrier Service Agreement as

---

[56]   *See Black's Law Dictionary* 814 (6th ed. 1990) (defining "interim" to mean "[i]n the meantime; meanwhile; temporary; between").

[57]   *IDT Liability Notice*, 23 FCC Rcd. at 10,810-811 ¶¶ 9, 10 (2008) (proposing "the following forfeitures for IDT's apparent violations: (1) a total of $500,000 for IDT's failure to file, within thirty days of execution, a copy of its Carrier Service Agreement with Teleco Haiti, and four subsequent amendments to the agreement; (2) a total of $400,000 for IDT's four failures to file a modification request with the Commission prior to establishing, or amending, contractual termination rates for Haiti-bound traffic; and (3) a total of $400,000 for IDT's implementation of rate terms on four occasions that varied from equivalent rates provided to another carrier serving the same U.S.-international route, prior to receiving Commission approval.").

[58]   *IDT Liability Notice*, 23 FCC Rcd. at 10,812 ¶ 13 n.49.

'interim.'"[59]  It then unequivocally rejected IDT's claim that the 2003 Agreement was an interim agreement:[60]

> First, IDT puts forth no evidence to support its assertion that the Carrier Service Agreement was interim in nature.  Indeed, the agreement on its face strongly suggests otherwise, and nowhere purports to establish terms, including rates, that were intended by the parties to be merely interim.  We find that the establishment of sequential, short-term rates that IDT has now provided to the FCC does not constitute an interim arrangement, particularly where, as here, such rates were established pursuant to the terms of an agreement that was clearly intended to be final, and there is no evidence to the contrary.[61]

In my professional opinion, and in keeping with the FCC's conclusions, even if there had been a valid "interim agreement" exception in the time period relevant to this case to the ISP filing requirement, the 2003 Agreement would not qualify because it was not entered into as a prelude to further negotiation and, by its terms, has perpetual duration.

**D.    IDT Conceded It Violated Federal Law and the FCC's Regulations When It Entered a Consent Decree With the FCC and Agreed to Pay a $400,000 Penalty and Institute Compliance, Training, and Reporting Programs.**

In October 2008, the FCC entered a Consent Decree and Order concluding its investigation into whether IDT violated federal law and FCC regulations by failing to file with the FCC the 2003 Agreement and subsequent amendments thereto.[62]  The FCC found that the ISP applied to the U.S.-Haiti route during the time period relevant to this case.[63]  The FCC found that IDT entered a carrier services agreement with Teleco Haiti in October 2003, which it subsequently amended four times in the period before the FCC lifted the ISP from the U.S.-Haiti

---

[59]    *Id.*

[60]    *IDT Liability Notice*, 23 FCC Rcd. at 10,813 ¶ 13.

[61]    *Id.* (citations and footnotes omitted; citing 2003 Agreement).

[62]    *IDT Consent Decree*, 23 FCC Rcd. at 15,621 ¶ 1.

[63]    *Id.* at 15,622 ¶¶ 3-4.

route in November 2004.[64]  In consideration for the FCC terminating its investigation, IDT agreed to pay a "voluntary contribution" of $400,000.[65]  IDT also agreed to develop an internal compliance and training program to ensure future compliance with the FCC's regulations regarding agreements with foreign carriers.[66]  In addition, IDT agreed to develop internal control processes to ensure compliance with the FCC's regulations, to file within fifteen days of executing the Consent Decree copies of all current foreign carrier service agreements subject to the ISP, and to file annual compliance reports for a thirty-six month period.[67]  Although the parties agreed that the Consent Decree did not constitute a finding of compliance or noncompliance,[68] IDT agreed to waive its right to seek reconsideration, review, appeal or otherwise challenge or contest its validity.[69]  It is my professional opinion that, considering the FCC's findings in the Consent Decree and IDT's waiver of its right to collateral attack, IDT has conceded that it violated the Communications Act of 1934 and FCC regulations.

---

[64]   *Id*. at 15,622-623 ¶ 5.

[65]   *Id*. at 15,625 ¶ 10.

[66]   *Id*. at 15,623-24 ¶ 9.

[67]   *Id*.

[68]   *Id*. at 15,626 ¶ 15.

[69]   *Id*. at 15,626 ¶ 12.

**IV.    CONCLUSION**

For the foregoing reasons, it is my professional opinion that FCC regulations required IDT to file with the FCC the 2003 Agreement within 30 days of execution, and that IDT failed to do so.  Moreover, it is my professional opinion that there is no "interim agreements" exception to this filing requirement that would have excused legally IDT's failure to file the 2003 Agreement and its subsequent amendments with the Commission.  Even if such an exception had existed, it is my professional opinion that it would have violated the APA and been unenforceable.  In my professional opinion, any such exception would not have applied to the 2003 Agreement, which was not interim, but instead final, in nature, and in fact pre-dated the so-called interim agreement exception.  Finally, it is my professional opinion that IDT has conceded that it violated the Communications Act of 1934 and FCC regulations.

Respectfully submitted,

Kent D. Bressie

Dated:  October 16, 2009.